993 A.2d 699

**Kristin HERLSON**

v.

**RTS RESIDENTIAL BLOCK 5, LLC, et al.**

**No. 2627, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

April 29, 2010.

DORS, and it ordered that Ms. B. have liberal unsupervised visitation with her children.

720

Saul M. Schwartzbach, Baltimore, MD, for Appellant.

John B. Raftery (Todd Kelting, Deckelbaum, Ogens & Raftery, Chrtd., on the brief), Bethesda, MD, for Appellees.

Panel: DEBORAH S. EYLER, MEREDITH and JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

JAMES A. KENNEY, III, Judge (Retired, Specially Assigned).

This appeal arises from a declaratory judgment action in the Circuit Court for Montgomery County filed on March 27, 2007, by appellant, Kristin Herlson. She sought a declaration of her rights under a contract for the purchase of a condominium unit then under construction in the Palladian Condominium at Rockville Town Square in Montgomery County. The action

was resolved in favor of appellees, RTS Residential Block 5, LLC, and RTS–RD Rockville Investments II, LLC, the sole member and manager of RTS Residential Block 5, LLC (collectively referred to as "RTS"), and against appellant.

In her complaint, appellant alleged that amendments made by RTS to the Public Offering Statement ("POS") materially affected her rights as a purchaser of the condominium and permitted rescission of the agreement by written notice to the seller within five days of receipt of the amendments. But, when she attempted to rescind her purchase contract, RTS refused to return appellant's deposit and to acknowledge rescission of her contract. Appellant requested that the circuit court: (1) adjudicate the rights and liabilities of the parties with respect to the contract; (2) declare that the changes made to the POS were substantial and material; and (3) declare that she had the right to rescind the contract.

RTS filed an answer to the complaint for declaratory judgment seeking dismissal of the complaint for failure to state a claim upon which relief could be granted.[1] RTS alternatively requested that the court declare that the changes made to the POS were neither substantial nor material and that appellant did not have the right to rescind her contract.

On November 16, 2007, appellant moved for summary judgment, which the court denied on January 23, 2008. At trial, on December 17, 2007, RTS's oral motion for judgment was denied, but, after hearing all of the testimony, the circuit court found in favor of RTS and, on December 24, 2007, filed a notice of judgment in RTS's favor. This timely appeal followed, presenting three issues for our review, which we have consolidated into two: [2]

---

1. RTS first moved to dismiss the complaint due to appellant's failure to abide by the mandatory arbitration provisions set forth in the sales contract. The circuit court denied the motion, finding that the sales contract also contained a provision, required by the Montgomery County Code, permitting a purchaser to disaffirm the arbitration clause in a contract for the sale of a new home and that appellant had disaffirmed arbitration and was entitled to litigate the matter in the circuit court.

2. Appellant also asked:

I. Whether the trial court erred in its interpretation of § 126 of the Maryland Condominium Act [(the "MCA"), Md.Code Ann. (1974, 2003 Repl.Vol.) § 11–126 et seq. of the Real Property Article ("Real Prop.").]

II. Whether the trial court erred in finding that the changes made to the condominium documents in the instant case did not materially affect the rights of the plaintiff as purchaser.

For the reasons that follow, we shall reverse the judgment of the circuit court.

## FACTS AND PROCEDURAL BACKGROUND

In 2005, appellant, an employee of the Mayhood Company, was assigned to perform sales and marketing tasks with respect to Rockville Town Square, a new community being developed by RTS in Montgomery County. She was given the opportunity to be one of the first purchasers of one of the condominium units that RTS had available for sale. Because of her employment, she was familiar with the POS relating to the sales contract for the condominiums.

On June 4, 2005, appellant entered into a sales contract for the purchase of a residential condominium unit in the Palladian Condominium, then under construction. The "initial sales price was $403,900,[3] and [a]ppellant made a deposit of $20,200."

Appellant's Sales Contract at Addendum # 4, Repurchase Addendum, provides, in pertinent part:

---

Whether the trial court erred in finding that § 126(e) of the [MCA] allows a purchaser to rescind the contract of sale only if changes to the condominium documents substantially affect the rights of the purchaser.

We have combined this question with question I, as they ask substantially the same question.

**3.** Appellant later added two parking spaces and a storage facility to the contract, raising the purchase price to $431,800.

[I]n further consideration of the mutual promise of the parties, the parties agreeing to be legally bound do hereby agree as follows:

1. Purchaser hereby represents to Seller that he/she is purchasing the Unit as his/her primary, year round residence and covenants and agrees not to lease the Unit until after the Purchaser has occupied the Unit as his/her principle year round residence for twelve (12) consecutive months. . . . . Seller shall have all remedies at law and in equity to enforce this covenant and agreement against Purchaser. . . .

2. Purchaser hereby agrees that if Purchaser sells the Unit within the twelve (12)-month period following the date of the Purchaser's acquisition of title to the Unit, Seller shall receive seventy-five percent (75%) of the Net Sales Proceeds, as defined below, from the sale of the Unit by the Purchaser. In order to induce Seller to sell the Unit to Purchaser, Purchaser agrees that the deed of conveyance from Seller conveying the Unit to Purchaser shall contain a covenant in favor of Seller for seventy-five percent (75%) of the Net Sales Proceeds, as defined below, of the sale of the Unit by the Purchaser if such sale occurs within the Restriction Period. For purposes of the Leasing and Resale Addendum, "Net Sales Proceeds" shall mean the total sales price of the Unit appearing on the settlement statement of the Purchaser, as seller, less the payoff of any bona fide lender holding a first deed of trust on the Unit, less down payment, less customary closing costs in Maryland payable to bona fide third parties unrelated to the Purchaser.

3. It is the **intent of the Seller** that these provisions are **to limit the sale of units to investors** and not to limit the flexibility of Purchaser who, in good faith, acquired to own the Unit **as his/her primary year round residence.** As such, the provisions of this Addendum shall not apply if unforeseen circumstances arise which require Purchaser to sell or lease the Unit prior to expiration of the Restriction Period. Such unforeseen circumstances shall include: [a. Job loss resulting in 10% decrease in annual income; b.

Relocation of employment over 50 miles from the Unit; c. Any reasonable change as approved by the Seller.]

(Emphasis added.)

The sample deed given to appellant as part of the POS included the following provision:

SPECIFICALLY RESERVING UNTO SELLER, the right to repurchase from the Purchaser the Unit, Parking Space and Storage Space in the event that Purchaser shall either sell, rent, or lease the Unit, or attempt to sell, rent or lease the Unit during the period that is twelve (12) months from the date of conveyance of the Unit to Purchaser (the "Repurchase Period"). In the event that Purchaser shall, or attempt to, convey, rent or lease the Unit during the Repurchase Period, the Purchaser shall be obligated to notify Seller in writing and Seller shall for a period of fifteen (15) days following its receipt of such written notice have the right (but not the obligation) to repurchase from the Purchaser the Unit, Parking Space and Storage Space at the same purchase price paid by Purchaser pursuant to the Purchase Agreement. . . . .

Appellant testified that she considered those provisions to be "significant aspects" of the POS. They were important in her decision to purchase because the restrictions would decrease the number of investment units, and thereby create a stable living environment, less prone to the turnover of leased apartments. In her view, they would ultimately help to increase the value of the condominium.

On January 31, 2007, appellant received a packet of materials from RTS that included "a few updates" to her POS.[4]

---

4. The amendments included the following: 1) change to the proposed Management Agreement to reflect the name of the council of unit owners; 2) change to the sample deeds to units in the Palladian; 3) deletion of section regarding the rights of the Maryland National Capital Park and Planning Commission as inapplicable; 4) changes to sales agreements and sample deeds for future sales to the effect that future purchasers would be prohibited from selling their units for two years instead of one year after purchase without forfeiting a portion of the net proceeds, and future purchasers would have no restriction on

Upon reviewing the documents, she found that the amended sales contract and deed for future purchasers no longer restricted the amount of time a purchaser would be required to occupy his or her unit before renting it and that the time a purchaser would be required to own the unit before selling it had been increased "from one to two years." [5]

When asked, "[H]ow did [the amendments to the POS] affect your thinking of purchasing a condominium," appellant stated:

> Well, it changed completely in my mind, because to me it affected the character of the community, it affected my investment that I put into it, and in the long run it would affect that, as well. Also, the fact that in those four buildings there are shared amenities, as well as, as the pool, and the fact that now there could be a full tenant occupancy in a building where I'm paying a condo fee to share those amenities didn't seem fair to me.

Appellant testified that this change to the condominium scheme would affect "the character of the community" and her long term investment negatively because buyers intending to occupy the units they have purchased would, presumably, take better care of their units than would more transient renters. According to appellant, had she known that such a change

---

their ability to lease their units; 5) change to sales agreement for MPDUs (moderately priced dwelling units); and 6) changes to the proposed Management Agreement to reflect the name of the Palladian's new management agent. While appellant attempted to rescind her sales contract based on her disagreement with all the amendments, in her brief, appellant's main argument is based on the effect of amendment number 4, the changes to the time restrictions on an owner's occupancy of the unit before selling or renting it. This opinion will focus on amendment four.

5. The documents reflect that the time a purchaser would be required to occupy the unit before selling it had been changed to "the date that the Seller conveys title to a buyer of the last unit within the Condominium to be sold by Seller (the 'Repurchase Period') (however, in no event shall the Repurchase Period go beyond such time that is two (2) years form (sic) the date of settlement of the Unit by Purchaser)[.]"

might be made to the condominium documents, she would not have contracted to purchase the unit.

Consequently, on February 1, 2007, appellant sent via certified mail, and hand-delivered to RTS, a letter advising that she did not agree with the changes to the POS and requesting the cancellation of her contract and the return of her deposit. RTS refused to cancel the contract or to return appellant's deposit.

At the close of appellant's case, RTS moved for judgment on the basis that appellant could rescind the contract only if the amendments materially affected her rights, and that the amendments did not do so. The circuit court, stating that there was no disagreement between the parties with respect to what the documents said, only with the interpretation of the documents, denied the motion.

RTS called as a witness Renee Finley, the attorney who had drafted most of the documents making up the POS at issue in the case, as well as the sales contract and addenda thereto. She testified that the amendment to Addendum 4 to the sales contract, the repurchase addendum, would affect only future sales, not the sale of units already under contract, such as appellant's. It was Finley's opinion that the changes to the deed for future purchasers did not in any way change the deed for which appellant had previously bargained.

H. Michael Schwartzman, vice president and director of development of Ross Development and Investment, testified that Addendum 4 was amended because, after an initial burst of sales of the condominium units at Rockville Town Square, "the [housing] market slowed, ... the Mayhood Company was replaced for lack of performance," and the new management recommended that "if [RTS] were to allow renting ..., but extended the sales lockout period, [it] would effectively be neutral but might be able to attract more purchasers." [6] In his opinion, those decisions and the resulting changes to the

---

6. At the time of trial, of the 152 units in appellant's building, the Palladian, 75 had been sold and 10 were under rent-to-own contracts.

POS documents did not affect appellant's contract. Appellant's contract was exactly the same as other purchasers with the same contract who had already settled on their units.

In closing, appellant argued that she was entitled to the benefit of her bargain, which was changed by the developer as a result of Amendment 4 to the POS. She stated that, pursuant to Real Prop. § 11–126(e), she was allowed to rescind the contract because changes were made to the purchaser's POS, which was part and parcel of her contract.

RTS argued that appellant had failed to show a single change to her contract, that is, something she bargained for in her individual contract that she did not receive from the developer. According to RTS, it could not have been the intent of the legislature, in enacting the applicable statute, to subject a developer making a change to its POS that did not materially affect a purchaser's rights to the risk that every purchaser could rescind his or her contract.

The circuit court ruled:

[G]oing to the statute that is involved here, I don't find- looking at every end of the plaintiff's argument, laboring over it and giving the plaintiff the benefit of the doubt in every way that, that we can, I don't find any of the alleged amendments to materially affect the plaintiff's rights at all. And we've gone over every one of them.

And I've gone over them ad nauseam, because, quite frankly, looked [sic] for a way to grant the plaintiff the relief that she is requesting. But in order for a court to do that, it must be legal. And to do it in this case, I don't find that you have the leg to stand on.

* * *

With respect to leasing unsold units and what the rights were with buyers that were going to come, obviously, after the plaintiff, that didn't affect this plaintiff's contract. Her contract didn't change at all. It didn't affect her rights materially.

* * *

So whether you go through with it and end up living there or not, certainly an argument could be made that a person who buys in a particular neighborhood, notwithstanding what you might think about their opinion regarding whether they're MPDUs [moderately priced dwelling units] or whether they're renters or what have you, you may not— one may not like a buyer's attitude about that, but in the real world, those are things that people are concerned about.

And when people buy homes they want to know what kind of neighborhood they're buying a home in. Right or wrong, they have a right to be concerned about that. And if it, if what you think you're buying is not what you're getting because of changes made by the seller, that's a real concern. It's a legitimate concern. And there is a place for that argument, it's just not in this case.

The plaintiff's case had to be based on what it was based upon, and that is the statute. Because real estate contracts in Maryland, and certainly in Montgomery County, are controlled by statute. The contracts themselves are form contracts ... and the terms of these contracts are, are there pursuant to the statute. And unless there is a clear violation of a statute or a breach of one of the terms, it is very difficult for plaintiffs to prevail in situations like this.

There isn't anything illegal. There isn't any violation of a statute that the Court can find in this case. As I said, even though I've searched for it, I've looked for it, but it's just not there. They haven't violated the statute at all. They haven't made any, any changes that materially affect the, the rights of the plaintiff.

Sure, the change, some of the changes, particularly with respect to changing the policies on rental units certainly will affect the plaintiff query [sic], whether it's material or not, query [sic] it will affect her rights. It certainly will affect her lifestyle. It'll affect her property values. It'll affect many things, you know, if she goes through with the contract, which is an option you have.

But the Court doesn't find that there's any violation of the statute here.

\* \* \*

There is still, notwithstanding the Court's ruling in this case, which—make it very clear for the, Mr. Clerk here, this is the, a declaratory judgment action, and the Court finds that the plaintiff does not have a right under the statute, as she has argued, to rescind the contract in this case.

## STANDARD OF REVIEW

Because this case involves the interpretation of Real Prop. § 11–126(e), "we review the Circuit Court's interpretation of the statute *de novo.*" *Gleneagles, Inc. v. Hanks,* 385 Md. 492, 496, 869 A.2d 852 (2005) (citing *Davis v. Slater,* 383 Md. 599, 604, 861 A.2d 78 (2004) (noting that because "provisions of the Maryland Code, and the Maryland Rules are appropriately classified as questions of law, we review the issues *de novo* to determine if the trial court was legally correct in its rulings on these matters.")); *See Schisler v. State,* 394 Md. 519, 535, 907 A.2d 175 (2006) ("As the question before the Court involves the interpretation and application of Maryland constitutional, statutory and case law, we shall review the case *sub judice* under a *de novo* standard of review."); *Hillsmere Shores Improvement Assoc. v. Singleton,* 182 Md.App. 667, 690, 959 A.2d 130 (2008).

## DISCUSSION

### Declaratory Judgment

 Declaratory judgments permit trial courts to "settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." Md.Code (2002 Repl.Vol., 2004 Supp.), § 3–402 of the Courts and Judicial Proceedings Article ("Cts. & Jud. Proc."). The Court of Appeals has held that "where a party requests a declaratory judgment, it is error for a trial court to dispose of the case simply with oral rulings and a grant of . . . judgment in favor of the prevailing party." *Ashton v. Brown,* 339 Md. 70, 87,

660 A.2d 447 (1995). " '[W]hen a declaratory judgment action is brought, and the controversy is appropriate for resolution by declaratory judgment, the trial court must render a declaratory judgment.' " *Md. Cas. Co. v. Hanson,* 169 Md.App. 484, 524, 902 A.2d 152 (2006) (quoting *Christ by Christ v. Maryland Dep't of Natural Resources,* 335 Md. 427, 435, 644 A.2d 34 (1994) (internal quotations omitted)).

In *Case v. Comptroller,* 219 Md. 282, 288, 149 A.2d 6 (1959), the Court of Appeals held that "whether a declaratory judgment action is decided for or against the plaintiff, there should be a declaration in the judgment or decree defining the rights of the parties under the issues made." *See also Md. Cas. Co.,* 169 Md.App. at 524, 902 A.2d 152 (quoting *Case* and citing *Christ by Christ,* 335 Md. at 435–436, 644 A.2d 34 ("[t]he court's rejection of the plaintiff's position on the merits furnishes no ground for" failure to file a declaratory judgment)); *Broadwater v. State,* 303 Md. 461, 467, 494 A.2d 934 (1985) ("the trial judge should have declared the rights of the parties even if such declaration might be contrary to the desires of the plaintiff"), *appeal after remand, Broadwater v. State,* 306 Md. 597, 510 A.2d 583 (1986); *East v. Gilchrist,* 293 Md. 453, 461 n. 3, 445 A.2d 343 (1982) ("where a plaintiff seeks a declaratory judgment . . ., and the court's conclusion . . . is exactly opposite from the plaintiff's contention, nevertheless the court must, under the plaintiff's prayer for relief, issue a declaratory judgment"), *appeal after remand,* 296 Md. 368, 463 A.2d 285 (1983); *Shapiro v. Board of County Com'rs,* 219 Md. 298, 302–303, 149 A.2d 396 (1959) (" 'even though the plaintiff may be on the losing side of the dispute, if he states the existence of a controversy which should be settled, he states a cause of suit for a declaratory decree.' 1 Anderson, Declaratory Judgments, Section 318.").

In *Salamon v. Progressive Classic Ins. Co.,* 379 Md. 301, 307, n. 7, 841 A.2d 858 (2004), the Court of Appeals quoted its decision in *Jackson v. Millstone,* 369 Md. 575, 593, 801 A.2d 1034 (2002), where it instructed:

"[T]he [trial] court must, in a separate document, state in writing its declaration of the rights of the parties, along

with any other order that is intended to be part of the judgment. Although the judgment may recite that it is based on the reasons set forth in an accompanying memorandum, the terms of the declaratory judgment itself must be set forth separately. Incorporating by reference an earlier oral ruling is not sufficient, as no one would be able to discern the actual declaration of rights from the document posing as the judgment. This is not just a matter of complying with a hyper-technical rule. The requirement that the court enter its declaration in writing is for the purpose of giving the parties and the public fair notice of what the court has determined."

(Internal quotations and citations omitted.)

■ Here, the record is devoid of a written declaration of rights, separate from and independent of the circuit court's judgment. As appellant had petitioned for a declaration of rights, it was error for the court to dispose of the case simply with an oral ruling and a grant of judgment in favor of a party. *Harford Mut. Ins. Co. v. Woodfin Equities Corp.,* 344 Md. 399, 414, 687 A.2d 652 (1997). This error, however, "is not jurisdictional and is not fatal to our reaching the merits of [the] appeal." *Bowen v. City of Annapolis,* 402 Md. 587, 609, 937 A.2d 242 (2007). We will exercise our discretion to review the merits of the presented controversy and order the circuit court, on remand, to enter an appropriate declaratory judgment order stating the rights of the parties that is consistent with this opinion.

## I.

The circuit court's ruling turned on its construction of the MCA, which provides, in pertinent part:

### § 11–126. Disclosure requirements.

(a) *Required contents of contract of sale.*—A contract for the initial sale of a unit to a member of the public is not enforceable by the vendor unless:

(1) The purchaser is given on or before the time a contract is entered into between the vendor and the

purchaser, a current public offering statement as amended and registered with the Secretary of State containing all of the information set forth in subsection (b) of this section; and

(2) The contract of sale contains, in conspicuous type, a notice of:

(ii) The purchaser's right to receive a public offering statement and his rescission rights under this section; and

(ii) The warranties provided by § 11–131 of this subtitle.

(b) *Sufficiency of public offering statement.*—The public offering statement required by subsection (a) of this section shall be sufficient for the purposes of this section if it contains at least the following:

(1) A copy of the proposed contract of sale for the unit;

(2) A copy of the proposed declaration, bylaws, and rules and regulations;

[(3)-(18)]

* * *

(d) *Amendment of material required by subsection (a).*—

(1) Following execution of a contract of sale by a purchaser, the vendor may not amend any of the material required to be furnished by subsection (a) of this section without the approval of the purchaser if the amendment would **affect materially the rights of the purchaser.**

(2) Approval is not required if the amendment is required by any governmental authority or public utility, or if the amendment is made as a result of actions beyond the control of the vendor or in the ordinary course of affairs of the council of unit owners.

(3) A copy of any amendments shall be delivered promptly to any purchaser and to the Secretary of State.

(e) *Purchaser's right to rescind contract of sale.*—Any purchaser may at any time (1) within 15 days following receipt of all of the information required under subsection (b) of

this section or the signing of the contract, whichever is later; and (2) **within 5 days following receipt of the information required under subsection (d) of this section, rescind in writing the contract of sale without stating any reason and without liability on his part,** and he shall be entitled to the return of any deposits made on account of the contract.

\* \* \*

(g) Waiver of purchaser's rights.—**The rights of a purchaser under this section may not be waived in the contract of sale and any attempted waiver is void.** However, if any purchaser proceeds to closing, his right under this section to rescind is terminated.

(Emphasis added.)

In *Kushell v. Dep't of Natural Res.*, 385 Md. 563, 576–77, 870 A.2d 186 (2005), the Court of Appeals reviewed the traditional rules of statutory interpretation:

The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature. Statutory construction begins with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology.

In construing the plain language, [a] court may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute; nor may it construe the statute with forced or subtle interpretations that limit or extend its application. Statutory text should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory. The plain language of a provision is not interpreted in isolation. Rather, we analyze the statutory scheme as a whole and attempt to harmonize provisions dealing with the same subject so that each may be given effect.

If statutory language is unambiguous when construed according to its ordinary and everyday meaning, then we give effect to the statute as it is written. If there is no ambiguity in that language, either inherently or by refer-

ence to other relevant laws or circumstances, the inquiry as to legislative intent ends; we do not need to resort to the various, and sometimes inconsistent, external rules of construction, for the Legislature is presumed to have meant what it said and said what it meant.

(Internal quotations and citations omitted.)

In *Int'l Ass'n of Fire Fighters, Local 1715 v. Mayor of Cumberland*, 407 Md. 1, 10, 962 A.2d 374 (2008), the Court of Appeals explained:

When the statute is part of a larger statutory scheme, it is axiomatic that the language of a provision is not interpreted in isolation; rather, we analyze the statutory scheme as a whole considering the "purpose, aim, or policy of the enacting body," *Serio v. Baltimore County*, 384 Md. 373, 390, 863 A.2d at 952, 962 (2004)[,] and "attempt to harmonize provisions dealing with the same subject so that each may be given effect." *Bowen*[, 402 Md. at 613–14, 937 A.2d 242 (2007).]

(Some citations omitted.)

 We consider "both the particular and the broad objectives" of the subject legislation. *Deville v. State*, 383 Md. 217, 223, 858 A.2d 484 (2004). We must also give statutes their " 'most reasonable interpretation in accord with logic and common sense.' " *Gorge v. State*, 386 Md. 600, 613, 873 A.2d 1171 (2005) (quoting *Greco v. State*, 347 Md. 423, 429, 701 A.2d 419 (1997)).

Appellant's arguments on appeal are straight-forward. In essence, she contends that § 11–126(e) says what it means and means what it says. Because the statutory language is, in her view, "demonstrably clear and unambiguous," there was no reason for the circuit court "to undertake an interpretation of § 11–126(e)." Having undertaken such an interpretation, the circuit court erred again in determining that the purchaser could rescind a contract for sale only if the changes to the POS *materially* affected the purchaser's rights. Moreover, and even if the circuit court's interpretation of the statutory language was correct, the court erred in concluding that the

changes to the POS did not affect materially the rights of the appellant.

RTS, on the other hand, contends that § 11–126(e) of the MCA is rendered ambiguous by § 11–126(d)(1) and (2) and its use of the word "approval:" (1) "may not amend ... without the *approval* of the purchaser if the result would affect materially the rights of the purchaser[;]" and (2) "*Approval* is not required if the amendment is required by governmental authority, or if the amendment is made as a result of events beyond the control of the vendor or in the ordinary course of affairs of the council of unit owners." According to RTS, "approval" in subsection (d)(1) and (2) is "synonymous" with the purchaser's rescission rights in subsection (e). We understand RTS's argument to mean that there is no right to rescission if a purchaser's approval is not required. According to RTS, appellant's interpretation of subsection (e) renders subsection (d)(1) and (d)(2) "superfluous" and ignores "the transitory nature of condominium development reflected throughout § 11–126." That "transitory nature" is reflected in words like "proposed," "projected," "estimated," "anticipated," and "contemplated" used to indicate certain components of the POS.

■ We look first, as we must, to the language of the statute itself. Section 126(e) provides, in pertinent part:

[A]ny purchaser may at any time ... within 5 days following receipt of the information required under subsection (d) of this section, rescind in writing the contract of sale without stating any reason and without liability on his part, and he shall be entitled to the return of any deposits made on account of the contract.

The plain language of § 11–126(e) is hardly ambiguous. The "information" that a purchaser is required to receive under § 11–126(d)(3), is "[a] copy of *any* amendment" to the POS. (Emphasis added.) Once a copy of *any* amendment is received, the purchaser has 5 days, pursuant to § 11–126(e), to rescind the contract. Significantly, the purchaser can rescind the contract without stating *any* reason.

Nor are we persuaded that subsections (d)(1) and (2) render the statute ambiguous. Subsections (d)(1) and (2) do deal with amendments to the POS. The first provides that no amendment that "would affect materially the rights of the purchaser" can be made "without the approval of the purchaser." The latter excepts from the purchaser's approval those amendments made for reasons "beyond the control of the vendor or in the ordinary course of affairs of the Council of unit owners," including an amendment "required by any governmental authority or public utility[,]" even if such an amendment would "affect materially the rights of the purchaser." An example might be an access or utility easement that negatively impacts the unit or the common area. Were that the case, should a purchaser not have the opportunity to rescind his contract even if his approval of the amendment is not required? This interpretation is consistent with the fact that subsection (d)(3) does not limit amendments to the POS that must be delivered to the purchaser to those for which approval is required. Instead, it requires the delivery of "any amendment." By permitting rescission "without stating any reason and without liability" on the purchaser's part, the issue of "materiality" rests with the purchaser to "approve" the amendment by proceeding to settlement or to "disapprove" by either rescinding the contract to purchase, or, perhaps, in some instances, renegotiating the contract. In sum, we see nothing in subsections (d)(1) or (d)(2) that indicates a clear intention to limit the purchaser's rescission rights under subsection (e).

From a policy standpoint, the right to rescission based on an amendment to the POS is not illogical. Whether an amendment materially affects the rights of a purchaser may, like beauty, be in the eyes of the beholder. If that issue must be resolved, ultimately, in a court or some other form of adjudicatory tribunal, neither the seller nor the purchaser will benefit when, as it most often is in projects of this nature, time is of the essence. Subsection (e) provides a simple and timely solution by giving the purchaser a narrow window of time to accept or reject an amendment to the POS.

Although we perceive no ambiguity, we have also considered the legislative history of Real Prop. § 11–126, which was enacted in 1975 as § 11–124 of the Real Property Article, providing, in pertinent part:

(b) *Change in material following delivery to purchaser.*— Any material furnished pursuant to subsection (a) may not be changed or amended following deliver [sic] to the purchaser, if the change or amendment would affect materially the rights of the purchaser, without first obtaining approval of the purchaser. A copy of any amendments shall be delivered promptly to the purchaser.

(c) *Purchaser's right to rescind contract of sale.*—Any purchaser may at any time (1) within 15 days following receipt of all of the information required pursuant to subsection (a) and (2) within five days following receipt of the information required pursuant to subsection (b), rescind in writing the contract of sale without stating any reason and without any liability on his part, and he shall be entitled to the return of any deposits made on account of the contract.

It was renumbered as § 11–126 by chapter 246, Acts of 1981. The Comment to the section notes that § 11–124 "contains entirely new material and represents one of the most comprehensive disclosure and anti-fraud provisions found in the Condominium Act of any jurisdiction." It states:

Section 11–124 does not necessarily require that the disclosure provisions shall be complied with prior to or at the time the condominium units are offered for sale, or even at the time that an agreement for the sale of a unit is executed. The section does provide for a 15–day "cooling off" period, however, and, pursuant to subsection 11–124(c), any "purchaser" has an unqualified right to rescind his agreement to purchase a condominium unit, by notice in writing to the "vendor" within 15 days "following receipt of all of the information required" to be disclosed pursuant to subsection 11–124(a), provided he has not elected to close without such information.

Section 11–124(a) is not intended to provide that recorded or even executed copies of the materials described in subsections 11–124(a)(1), 11–124(a)(2), 11–124(a)(3) or 11–124(a)(5) be furnished to the purchaser. These materials may be in the nature of unrecorded unexecuted drafts. However, in the event of any change or amendment which would *"materially* affect the rights of the purchaser" then the purchaser must be furnished with the changes or amendments and shall have 5 days following his receipt of the amended materials within which to rescind his agreement of sale. If the purchaser does not elect to rescind within the time provided in subsection 11–124(c), then the amendments shall be considered approved.

The right to rescind created pursuant to subsection 11–124(c) may be exercised by the purchaser without liability. Subsection 11–124(e) prohibits attempts to waive the "rights of the purchaser" to receive the information and materials required to be disclosed pursuant to this section and prohibits attempts to waive the "rights of the purchaser" to rescind. However, the purchaser may elect to waive his right to rescind by proceeding to close. This provision avoids possible clouds on title. It also permits the purchaser to obtain mortgage financing to enable him to close if he wishes. ....

Real Prop. § 11–124 Comment (1975 Cum.Supp.) (emphasis in original).

We are not persuaded that this Comment necessarily overcomes the plain language of § 11–126(e) and implies an intent to limit the right of rescission. Obviously, there is every reason to assume that most purchasers would not rescind if they did not find the amendments in some way material to their rights.[7] At the same time, by receiving copies of *any* amendments, they are given a limited opportunity to make a

---

7. We recognize that appellant had earlier sought to be relieved from her contractual obligation for reasons unrelated to the POS amendments. That did not appear to play any part in the circuit court's opinion.

determination of materiality and to rescind without stating any reason. If they do not, "then the amendment shall be considered approved." The purchaser "waives his or her right to rescind by proceeding to close." Not only does this expedited "approval" process "avoid possible clouds on title" presented by outstanding contracts that have not gone to settlement, it "permits the purchaser to obtain mortgage financing to enable him to close if he wishes." Real Prop. § 11–124 Comment (1975 Cum.Supp.) (emphasis in original).

■ RTS points out that "the Maryland Secretary of State's office interprets § 11–126 in the same way that statute was interpreted by the circuit court." As to any deference that should be extended to the interpretation of the statute by the Office of the Maryland Secretary of State (the "Secretary"), we recognize that the Secretary is responsible for the registration of condominiums under § 11–127, which requires filing a POS as described in § 11–126. Section 11–127(c) provides that the Secretary shall determine "whether the application [for registration] satisfies the disclosure requests of § 11–126...." Section 11–127(e) states that the Secretary is "responsible for the administration of the section," and "may adopt, amend, and repeal regulations necessary to carry out the requirements of the provisions of this section" and "prescribes form and practices for submitting applications." We see nothing in the statute that establishes the Secretary as the arbiter of a contract purchaser's rescission rights.

■ In this instance, the Secretary, through a "Condominium and Time Share Officer[,]" opined that the proposed amendments "would not affect materially the rights of the contract purchaser," that approval by the purchaser was not required, and that the purchaser was not entitled to rescind within five days of receipt of the amendments. These opinions were not admitted by the court as "accurate statement[s] of the law" or "as proof that the changes were not material," but only as "part of [a witness's] decision making process." Not only does the record not reflect that such opinions represent "the consistent and long-standing construction given a statute

by the agency charged with administering it[,]" *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 445, 697 A.2d 455 (1997) (citation omitted), an agency's construction of the statute is "not entitled to deference [ ] when it conflicts with the unambiguous statutory language." *Id.* at 446, 697 A.2d 455 (citation omitted).

## II

■ But, even if we were to assume an ambiguity in the plain language of the statute and that the interpretation of the circuit court was correct, we are persuaded that the changes to the POS concerning the rental of purchased units materially affected the rights of appellant.

RTS argues that the phrase "rights of the purchaser" refers only to the affirmative rights afforded appellant under the terms of her individual sales contract. Because the amendment did not change, for example, appellant's contract right to occupy or resell her unit or utilize the common areas, the amendment did not affect appellant's rights.

Asking that we remember that the statute at issue is a remedial statute, appellant asserts a broader interpretation of "the rights of the purchaser." She contends that the General Assembly did not intend to limit the phrase to refer only to a purchaser's rights under the terms of her individual contract, but to her rights as a purchaser generally, including her right to the benefit of her bargain and her right to rely on the representations of the seller, including sales and leasing restrictions, concerning the character of the complex. According to appellant, RTS breached the contract by representing that appellant was buying into an owner-occupied building with lease and sales restrictions in the first year, and, then, after she signed the sales contract, notifying her that the leasing restrictions promoting owner occupation of the condo complex were no longer in place.

"Material" is defined by *Black's Law Dictionary* 991 (7th ed. 1999) as "[o]f such a nature that knowledge of the item

would affect a person's decision making process; significant; essential[.]"

The District Court of Appeals for the Fourth District of Florida had occasion to interpret § 718.506 (2009) of Florida's Condominium Statute, which provides:

(1) Any person who, in reasonable reliance upon any material statement or information that is false or misleading and published by or under authority from the developer in advertising and promotional materials, including, but not limited to, a prospectus, the items required as exhibits to a prospectus, brochures, and newspaper advertising, pays anything of value toward the purchase of a condominium parcel located in this state shall have a cause of action to rescind the contract or collect damages from the developer for his or her loss prior to the closing of the transaction. After the closing of the transaction, the purchaser shall have a cause of action against the developer for damages under this section from the time of closing until 1 year after the date upon which the last of the events described in paragraphs (a) through (d) shall occur:

(a) The closing of the transaction;

(b) The first issuance . . . of a certificate of occupancy[.]

. . . .

(c) The completion by the developer of the common elements and such recreational facilities, whether or not the same are common elements, which the developer is obligated to complete or provide under the terms of the written contract or written agreement for purchase or lease of the unit; or

(d) In the event there shall not be a written contract or agreement for sale or lease of the unit, then the completion by the developer of the common elements and such recreational facilities, whether or not the same are common elements, which the developer would be obligated to complete under any rule of law applicable to the developer's obligation.

. . . .

That court interpreted "[a] change to a purchase agreement" as "material" if a "reasonable buyer under the purchase agreement [would] find the change to be so significant that it would alter the buyer's decision to enter into the contract[ ]" and it defined "adverse" as something "[c]ontrary to one's interests or welfare; unfavorable." *Mastaler v. Hollywood Ocean Group, L.L.C.*, 10 So.3d 1114, 1116 (Fla.Dist.Ct.App. 4th Dist.2009) (internal quotations omitted).

In this case, appellant testified that her decision to purchase the unit was influenced by RTS's promotion of the condominium as an owner-occupied development.[8] In *Villas West II of*

---

8. The Sales Contract at Addendum # 4, Repurchase Addendum, states:

> [I]n further consideration of the mutual promise of the parties, the parties agreeing to be legally bound do hereby agree as follows: 1. Purchase hereby represents to Seller that he/she is purchasing the Unit as his/her primary, year round residence and covenants and agrees not to lease the Unit until after the Purchaser has occupied the Unit as his/her principle year round residence for twelve (12) consecutive months. .... Seller shall have all remedies at law and in equity to enforce this covenant and agreement against Purchaser....
>
> ❖ ❖ ❖
>
> 3. It is the **intent of the Seller** that these provisions are **to limit the sale of units to investors** and not to limit the flexibility of Purchaser who, in good faith, acquired to own the Unit as **his/her primary year round residence.** As such, the provisions of this Addendum shall not apply if unforeseen circumstances arise which require Purchaser to sell or lease the Unit prior to expiration of the Restriction Period. Such unforeseen circumstances shall include: [a. Job loss resulting in 10% decrease in annual income; b. Relocation of employment over 50 miles from the Unit; c. Any reasonable change as approved by the Seller.]

(Emphasis added.)

The sample deed given to appellant as part of the POS included the following provision:

> SPECIFICALLY RESERVING UNTO SELLER, the right to repurchase from the Purchaser the Unit, Parking Space and Storage Space in the event that Purchaser shall either sell, rent, or lease the Unit, or attempt to sell, rent or lease the Unit during the period that is twelve (12) months from the date of conveyance of the Unit to Purchaser (the "Repurchase Period"). In the event that Purchaser shall, or attempt to, convey, rent or lease the Unit during the Repurchase Period, the Purchaser shall be obligated to notify Seller in writing and Seller shall for a period of fifteen (15) days following its receipt of such written notice have the right (but not the obligation) to repurchase from the Purchaser the Unit, Parking Space and Storage

*Willowridge Homeowners Ass'n v. McGlothin,* 885 N.E.2d 1274, 1284 (Ind.2008), *rehearing denied sub nom, Villas W. II of Willowridge Homeowners Ass'n v. Ashcraft,* 2008 Ind. Lexis 934 (Ind. Oct. 1, 2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 1527, 173 L.Ed.2d 657 (2009), the Supreme Court of Indiana explained perceived differences of owner occupied versus rented developments. It stated, *id.*:

> Owners who occupy their property have an incentive to improve and update because they can both enjoy the improvements and reap the fruits of their labor upon selling the home.
>
> In a rental situation, however, this incentive is weakened because of divided ownership and occupancy. The renter lacks some incentive to improve the property because he or she would only benefit from the current enjoyment, not from an increased market value. .... [I]t seems obvious that an owner-occupant is both psychologically and financially invested in the property to a greater extent than a renter. [n 10 Surely, the psychology of this is recognized by prospective purchasers, who assess whether to make purchases based in part on expectation that owner-occupant neighbors are likely to make such investments in maintenance.] Personal motivation can surely achieve better results than contractual compulsion in many cases. This is not a matter of reweighing evidence. Both parties' experts testified that owners maintain property better than do renters.

Here, appellant testified that she would not have purchased the condominium unit had she known she were buying into a rental property complex. We are persuaded that a reasonable buyer would find the change from owner-occupied to renter-occupied to be significant enough to alter the buyer's decision to enter the contract. Therefore, the amendment to the POS was material to the rights of appellant under the statute in this case.

---

Space at the same purchase price paid by Purchaser pursuant to the Purchase Agreement. ....

The obvious purpose of the amendment was to increase the sales of units. Whereas the marketing approach under which appellant bought excluded—or, at least, discouraged—investor-owners through one-year sale and lease restrictions on the units, the amendment to be applied to future contracts was designed to attract investors by eliminating the one-year leasing restriction. That approach could result in a major change in the character of the community.

It is quite clear that the original marketing approach was to induce appellant and others to purchase into an owner-occupied condo complex. RTS explicitly represented in the POS sample sales contract the intent to "limit the sale of units to investors" and reinforced this intention with a right to repurchase a rented unit in the sample deed.[9] Appellant was entitled to rely on the seller's representation to her that she was buying into an owner-occupied community when making a $400,000 decision to purchase the unit. We do not characterize the marketing approach as a "bait and switch," but, the amendment, in our view, entitled appellant and others who bought in under the original terms, to rescind their contracts if they chose to do so within the statutory time frame.

RTS argues that the sales contract provided that, had the seller not sold all of the units, it would have had the right to directly lease out the apartments. If that happened, appellant could have ended up living in a condominium that included leasees. We do not find this argument particularly persuasive. RTS did not represent that it would not attempt to sell the unsold condo units and seek out only leasees at the time appellant signed the sales contract.

RTS made the decision to change the character of the complex for its own financial reasons, and it was entitled to do

---

**9.** For example, deeds recorded prior to RTS's January 31, 2007 modification of the proposed deed in the POS would presumably include the language in the sample deed. The recordation of these deeds containing the one year lease and sale restriction served to perpetuate RTS's notice to the public that the restriction applied generally to the complex, not to individual units.

so. A seller may determine, for whatever purpose, that the proposed marketing plan and restrictions on the use of units has been unsuccessful. But, when the changes require amendments to the POS, the seller must accept the risk of rescission by purchasers who bought under the earlier proposal. As the circuit court recognized, whether a community is primarily made up of owners or renters is important to the decision to purchase a residence, especially in a common interest community involving shared facilities and costs. The circuit court stated:

> So whether you go through with it and end up living there or not, certainly an argument could be made that a person who buys in a particular neighborhood, notwithstanding what you might think about their opinion regarding whether they're MPDUs [moderately priced dwelling units] or whether they're renters or what have you, you may not—one may not like a buyer's attitude about that, but in the real world, those are things that people are concerned about.
>
> And when people buy homes they want to know what kind of neighborhood they're buying a home in. Right or wrong, they have a right to be concerned about that. And if it, if what you think you're buying is not what you're getting because of changes made by the seller, that's a real concern. It's a legitimate concern. . . . .

Section 11–126 was enacted to encourage comprehensive disclosure by sellers and to provide anti-fraud protections to purchasers. For this reason, we are not persuaded that the General Assembly intended to narrowly limit the purchaser's "rights" under Real Prop. § 11–126(e) to the property rights provided in a contract for a single unit. Therefore, we are persuaded that it was error for the circuit court to focus only on how the amendment affected appellant's contract, and, because "her contract did not change at all," to conclude that the amendment did not "affect her rights materially." As the circuit court stated, knowing "what kind of a neighborhood [a purchaser is] buying a home in" is a "real" and "legitimate concern." In our view, it is a material concern that, in the circumstances of this case, would permit rescission.

JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY REVERSED; CASE REMANDED TO THE CIRCUIT COURT TO ENTER DECLARATORY JUDGMENT CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.