16 A.3d 991

**DAVID N.**

v.

**ST. MARY'S COUNTY DEPARTMENT OF SOCIAL SERVICES.**

**No. 1450, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

April 1, 2011.

**176**

Brian L. DeLeonardo, Reisterstown, MD, for appellant.

Sandra Barnes (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: EYLER, DEBORAH S., ZARNOCH, KEHOE, JJ.

EYLER, DEBORAH S., J.

The sole issue in this appeal is whether a local department of social services for a Maryland county can investigate a report of suspected child abuse or neglect when the abuse or neglect is alleged to have happened in Maryland but the child victim lives out of state. David N., the appellant, maintains that the answer to that question is no, and that the St. Mary's County Department of Social Services ("the Department"), the appellee, had no power to investigate the report of suspected child sexual abuse made against him in this case. For that same reason, he argues, the Department of Human Resources ("DHR") erred in upholding the Department's finding that he committed indicated child sexual abuse, and the Circuit Court for St. Mary's County further erred in upholding the DHR's decision.

We disagree with David N., and hold that the controlling statute, Md.Code (2006 Repl.Vol., 2009 Supp.) section 5-706 of

the Family Law Article ("FL"), authorizes, and indeed requires, a Maryland local department of social services to investigate a report of suspected abuse or neglect in Maryland of a child who lives outside of Maryland.[1] Accordingly, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

On May 26, 2007, David N., then 15 years old and a resident of Frederick County, attended a picnic at his family's summer home in St. Mary's County. Also present at the picnic was David's cousin, a 4–year–old girl whose home was in the State of Virginia. Sometime after the picnic, the Department received a report alleging that David had sexually abused the 4–year–old girl at the picnic. After investigating the report, the Department made a finding of indicated child sexual abuse against David.[2]

David appealed the Department's finding to the DHR, requesting a contested case hearing before an administrative law judge ("ALJ") in the Office of Administrative Hearings ("OAH"). *See* FL § 5–706.1(b) (permitting a person against whom a finding of indicated child abuse or neglect has been made to request a contested case hearing, pursuant to Subtitle 2 of the State Government Article, to appeal the finding). The OAH acts as the final decision-maker for the DHR in such

---

1. In this opinion, unless otherwise stated, all statutory references are to the Family Law Article.

2. "Sexual abuse" of a child is "any act that involves sexual molestation or exploitation of a child by a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member." FL § 5–701(x)(1). A "[f]amily member" is a "relative by blood, adoption, or marriage of a child." FL § 5–701(h).

"Indicated" means "a finding that there is credible evidence, which has not been satisfactorily refuted, that abuse, neglect, or sexual abuse did occur." FL § 5–701(m). This is by contrast to "[r]uled out," which "means a finding that abuse, neglect, or sexual abuse did not occur," and "[u]nsubstantiated," which "means a finding that there is an insufficient amount of evidence to support a finding of indicated or ruled out." FL §§ 5–701(w) and (y), respectively.

appeals. Md.Code Regs. 07.01.04.21. *See* Md.Code (2009 Repl.Vol., 2010 Supp.), section 10–205(b)(5) of the State Government Article ("SG").

The contested case hearing was held on October 20, 2008. David stipulated that during the picnic he took his 4–year–old cousin into a bedroom, removed her pants and underwear, and his own, and rubbed his penis against her, penetrating her anus. He moved to dismiss the administrative charge, however, on the ground that the Department lacked statutory authority to investigate the report of suspected abuse against him and therefore to make a finding against him based on its investigation.

Specifically, David argued that section 5–706, concerning investigations of reports of suspected child abuse or neglect alleged to have happened in Maryland, only grants a local department of social services authority to investigate such a report when the child victim "lives in this State"; therefore, the local department does not have authority to investigate a report of suspected child abuse or neglect that happened in Maryland when the child victim lives outside of Maryland. He maintains that, in his case, because the alleged abuse took place in Maryland but the victim was not living in Maryland, the Department had no power to investigate the report of suspected abuse or to make a finding as to whether the abuse happened, as making such a finding is part of the investigation. FL § 5–706(h) and (i).

The Department opposed the motion to dismiss, arguing among other things that David was misinterpreting section 5–706 and other related statutes.

The ALJ heard argument on the motion to dismiss and received supplemental memoranda of law from the parties. On December 1, 2008, she issued a written decision and order ruling that the Department did not have statutory authority to investigate a report of suspected child abuse or neglect alleged to have happened in Maryland when the child was not a resident of Maryland, and granting the motion to dismiss on

that basis. The ALJ's decision was the decision of the OAH, and hence the final decision of the DHR.

In the Circuit Court for Frederick County, the Department filed a timely action for judicial review of the final administrative decision. SG § 10–222(a). On July 15, 2009, after receiving memoranda of law, the court held a hearing. On July 31, 2009, it issued a memorandum opinion and order, docketed on August 3, 2009, reversing the final decision of the DHR.

This timely appeal followed.

## STANDARD OF REVIEW

In an appeal from an administrative agency's final decision, this Court reviews the agency's decision, not the circuit court's decision. *Halici v. City of Gaithersburg*, 180 Md.App. 238, 248, 949 A.2d 85 (2008). The agency decision in this case was that, as a matter of law, the Department did not have authority under FL section 5–706(a) to investigate the report of suspected child abuse against David because the alleged abuse happened in Maryland but the victim was not living in Maryland. The decision, being a matter of statutory interpretation, is a purely legal issue. Because we are deciding a legal question, we review the agency's decision *de novo*. *Schwartz v. Md. Dep't of Natural Res.*, 385 Md. 534, 554, 870 A.2d 168 (2005); *Charles County Dep't of Soc. Servs. v. Vann*, 382 Md. 286, 295, 855 A.2d 313 (2004). We do, however, give some deference to the agency's interpretation of the statute it administers. *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 69, 729 A.2d 376 (1999).

## DISCUSSION

### *Pertinent Statutory Language and Framework*

David's contention focuses on section 5–706, entitled "Investigation," which states, in relevant part, that "[p]romptly after receiving a report of suspected abuse or neglect of a child who lives in this State that is alleged to have occurred in this State," the local department of social services shall conduct an

investigation. FL § 5–706(a). As he did below, David asserts that this language plainly limits a local department's authority to investigate a report of suspected abuse or neglect of a child in Maryland to cases in which the victim lives in Maryland. Alternatively, David maintains that, even if the critical statutory language is ambiguous, his interpretation is supported by the legislative history.

As it did below, the Department counters that the plain language of subsection 5–706(a), the relevant legislative history, and DHR's longstanding interpretation of the statute make clear that a local department of social services is authorized to investigate a report of suspected child abuse or neglect alleged to have been perpetrated in Maryland, regardless of where the victim was residing when the abuse was committed. The Department further asserts that if the statutory language is ambiguous it should be construed to confer investigative authority on the local departments in these situations.

Title 5 of the Family Law Article governs "Children," and subtitle 7, with which we are concerned, addresses "Child Abuse and Neglect." The sections pertinent to the issue before us, in addition to the general definitions in section 5–701, are those stating the legislative policy of the subtitle (5–702) and its scope and applicability (5–703); three sections governing reporting of child abuse and neglect (5–704, 5–705, and 5–705.1); and section 5–706, which, as mentioned above, pertains to an "Investigation."

The expressly-stated legislative policy of subtitle 7 is "to protect children who have been the subject of abuse or neglect" by mandating reporting, conferring immunity on those who make reports,[3] requiring prompt investigation of reports with cooperation among responsible agencies, and requiring local departments of social services to render appropriate services to the abused and neglected children. FL § 5–702. Generally, subtitle 7 applies, and only applies, to "suspected abuse or neglect that is alleged to have occurred in this

---

3. *See* FL section 5–708, entitled, "Immunity of person making report."

State" *and* "suspected abuse or neglect of a child who lives in this State, regardless of where the suspected abuse or neglect is alleged to have occurred." FL § 5–703(b)(1) and (2). (That subsection carves out an exception—"as otherwise provided in § 5–705.1," which we shall discuss *infra.*)

■ Thus, ordinarily, subtitle 7 applies to two categories of children: (1) all children thought to have been abused or neglected *in Maryland and* (2) all children *who reside in Maryland* and are thought to have been abused or neglected *anywhere.* The former category encompasses the child victim in this case, as she was suspected of having been sexually abused in Maryland.

### Reporting Obligations

■ The reporting sections of subtitle 7 mandate, with some exceptions, the duties to report suspected child abuse or neglect owed by certain professionals, and then by the population at large. Section 5–704 obligates identified professionals (health care practitioners, police officers, educators, and human services workers) to report suspected child abuse to the local department of social services or the appropriate law enforcement agency and to report suspected child neglect to the local department of social services. It draws no distinction in this reporting duty between child victims living inside or outside Maryland or between suspected abuse or neglect thought to have happened inside or outside Maryland. As long as the victim is a child *and the mandated reporter is acting in his or her professional capacity in Maryland,* the report must be made. The section, which has no exceptions, specifies the manner, timing, and contents of such a report.

Section 5–705 establishes the duty of all other persons (*i.e.,* those who are not covered by section 5–704) to report suspected child abuse or neglect. Like the report required by section 5–704, a section 5–705 report must be made to the local department in the case of suspected child neglect and to either the local department or the appropriate law enforcement agency in the case of suspected child abuse. Also like section

5–704, the duty to report in section 5–705 applies to all children suspected of being abused or neglected, without any limitation based upon a child victim's state of residence or the place where the abuse or neglect is thought to have happened. Unlike section 5–704, the duty to report established in section 5–705 is subject to two exceptions (neither of which applies here).[4] Section 5–705 details the form the report may take and its contents but does not impose a time frame on the duty to report.

Section 5–705.1 specifies how a report of suspected child abuse or neglect is to be made, and by whom it is to be investigated, when the suspected abuse or neglect happened outside of Maryland *and* the victim lives outside of Maryland. In that situation, a mandated reporter under section 5–704 or section 5–705 "shall report the suspected abuse or neglect to any local department," § 5–705.1(c)(1), which for purposes of section 5–705.1 means a department of social services for a county in Maryland. FL § 5–705.1(a). The local department receiving the report must promptly forward it "to the appropriate agency outside of this State that is authorized to receive and investigate reports of suspected abuse or neglect." FL § 5–705.1(d). Thus, a mandated reporter must report, to a Maryland county local department of social services, suspected abuse or neglect that happened outside of Maryland against a child who lives outside of Maryland, but the report is not to be investigated by that department; instead, it is to be forwarded to the appropriate authority outside of Maryland for investigation.

In summary, the reporting duties imposed by sections 5–704, 5–705, and 5–705.1, taken together, apply to the universe of children suspected of being abused or neglected, regardless of where the abuse or neglect is thought to have happened or where the child victim lives. Under section 5–705.1, when the suspected abuse or neglect is thought to have

---

**4.** The exceptions relate to the attorney-client privilege and the priest-penitent privilege. *See* FL § 5–705(a)(2) and (3).

happened out of state and the child victim lives out of state, however, the report will be made to a Maryland local department but will be forwarded to, and investigated by, the appropriate out-of-state authority.

### Investigations of Reports

As noted, section 5–706 governs investigations of reports of suspected child abuse and neglect by Maryland local departments of social services and, in cases of abuse, local law enforcement agencies. Subsection (a), which we have quoted above and is central to this case, imposes upon a local department, in the case of neglect, and the local department or law enforcement agency, in the case of abuse, a duty to investigate "a report of suspected abuse or neglect of a child who lives in this State that is alleged to have occurred in this State[.]" Subsections (b) and (c) establish the timing, mandated steps, and scope of the required investigation.

Subsection (j) of section 5–706 establishes a separate mode of investigation that is triggered when a local department receives a report of suspected abuse or neglect of a child who lives in Maryland when the abuse or neglect happened outside of Maryland. In such a situation, the local department must forward the report to the appropriate out-of-state agency for investigation and, if asked, cooperate with that agency in its investigation. Cooperation may include interviewing the child for safety and providing services to the child and the child's family. So, when a child living in Maryland is the victim of suspected abuse or neglect outside of Maryland, the local department to whom a report is made may participate in the investigation, but only if invited to do so by the out-of-state authority.

### The 2003 Statutory Amendments

The pertinent sections of subtitle 7, including section 5–706(a), were substantially amended in 2003, four years before the alleged child sexual abuse in this case. David concedes, as he must, that, if the report of suspected child abuse that was made against him had been made before the 2003 amendments

became effective, the Department would have been authorized by section 5–706, in its form at that time, to investigate the report and make a finding as to whether the suspected abuse happened. His contention that the Department lacked to the authority to investigate the report made against him, after the 2003 amendments were in force, rests entirely upon the language changes to section 5–706 effected by those amendments. Therefore, in order to fully discuss David's contention in this case, we must explain the changes that were made by the 2003 amendments to the relevant sections in subtitle 7.

Before 2003, none of the relevant sections defined the coverage of subtitle 7 with reference to the place of the alleged abuse or neglect or the residence (or present location) of the child victim. Section 5–703 simply stated that the scope of subtitle 7 was "in addition to and not in substitution for the provisions of Title 3, Subtitle 8 of the Courts and Judicial Proceedings Article." [5] It said nothing about the subtitle's application. Just as they do today, sections 5–704 and 5–705 imposed reporting duties upon certain professionals (the former) and with two exceptions all other people (the latter), with the reporting duties covering all reports of suspected abuse or neglect of a child, regardless of where the abuse or neglect took place or the child's residence or present location. Section 5–705.1 (report of abuse that happened out of state to a victim living out of state) did not exist; and section 5–706 mandated only that all reports of suspected abuse or neglect be investigated, either by the local department (neglect) or by the local department or law enforcement agency (abuse), without any reference to the place of abuse or neglect or the victim's residence or present location.

The events leading up to the enactment of the 2003 amendments actually began in 1991. On July 22 of that year, Maryland Attorney General J. Joseph Curran, Jr., wrote to

---

5. Title 3 of the Courts and Judicial Proceedings Article is entitled "Courts of General Jurisdiction—Jurisdiction/Special Causes of Action." Subtitle 8 of that title governs "Juvenile Causes—Children in Need of Assistance."

Pamela F. Corckran, Chairperson of the Governor's Council on Child Abuse and Neglect, bringing to the council's attention the "issue whether the law requires a report of child abuse or neglect that took place outside of Maryland, when no child victim is in Maryland." Letter of July 22, 1991 ("July 1991 Letter"), at 1. In his letter, Attorney General Curran reasoned that because the agencies to which reports must be made under sections 5–704 and 5–705 as they then existed all were Maryland agencies, those sections could not reasonably be read to require reporting of suspected abuse or neglect of children outside of Maryland, at least when the children were not residents of or presently located in Maryland. *Id.* at 2.

The Attorney General explained that it was not reasonable to interpret the statutes to require reporting to out-of-state agencies, especially given that the making of a report gives rise to a duty to investigate under section 5–706, and "unless a child potentially in need of protection is now in Maryland (regardless of where the alleged incident occurred)," Maryland law could not be read to require reports of out-of-state child abuse or neglect to Maryland agencies. July 1991 Letter, at 2. Observing that it appeared that the "General Assembly never focused on the issue of out-of-state incidents," he suggested that the council consider seeking legislation to remedy the deficiencies in the law. *Id.* at 2–3.

Eleven years later, in 2002, media coverage about St. Luke Institute, a psychiatric hospital in Silver Spring, prompted legislative action. Psychiatrists at St. Luke Institute were treating Catholic priests who had sexually abused children in other states, and had come to Maryland for treatment. The acts of abuse had been perpetrated outside of Maryland and the child victims were located outside of Maryland. The treating psychiatrists took the position that, under the circumstances, they were not required by Maryland law to make reports of child sexual abuse to Maryland local departments of social services (or to law enforcement, or to any Maryland or out-of-state authority). This position was consistent with the opinion stated in the July 1991 Letter.

Because in the course of the media coverage about the St. Luke Institute issue misunderstandings arose about the meaning of the July 1991 Letter, on June 25, 2002, the Office of the Attorney General ("OAG") issued an opinion letter clarifying the reporting requirements of the law as it then existed ("June 2002 Letter"). The June 2002 Letter explained that section 5–704 in its then-current form "requires health care practitioners to report suspected child abuse if the abuse occurred in Maryland or, wherever the abuse occurred, if the child is now in Maryland." June 2005 Letter, at 1. The letter went on to state, "The statutory mandate [to report] is inapplicable only if a health care practitioner has reason to believe that the abuse occurred exclusively outside Maryland and the victim is not currently in Maryland." *Id.* The June 2002 Letter summarized then-existing Maryland law as requiring Maryland health care providers to report suspected child abuse (or neglect),

> in either of the following situations: ... [1] *A practitioner has reason to believe that a child was abused in Maryland even once, no matter how long ago the alleged abuse occurred, no matter whether most instances of the abuse occurred out-of-state, and no matter whether the child is now in Maryland* ... [2] *A practitioner has reason to believe that a child was abused in another state but is now in Maryland.*

June 2002 Letter, at 2–3 (emphasis in original).

In the next legislative session, HB 550 was introduced to cover the reporting gap that existed for child abuse or neglect suspected to have happened outside Maryland of a child who does not reside or is not present in Maryland, *i.e.*, the situation with respect to the child victims of the priests who were receiving psychiatric treatment at St. Luke Institute. *See* 2003 Laws of Maryland, ch. 308. The revised "Fiscal and Policy Note" for HB 550 explains in the "Bill Summary" section:

> This bill provides that if abuse or neglect is alleged to have occurred outside of Maryland and the victim is currently under age 18 and lives outside of Maryland, then a health

care practitioner, police officer, educator, or human services worker, or other person, except as otherwise provided by statute, who would otherwise be required to report the suspected abuse or neglect, must report the suspected abuse or neglect to any [local department of social services in Maryland] as soon as possible.

*Fiscal and Policy Note (Revised) to HB 550*, at 1–2.

In two paragraphs distinguishing, under the proposed new law, the steps a local department must take upon receiving a report of suspected child abuse or neglect alleged to have happened outside of Maryland to a child not living in Maryland from the steps a local department must take upon receiving a report of suspected child abuse or neglect alleged to have happened outside of Maryland to a child living or present in Maryland, the "Bill Summary" section states:

> Promptly after receiving a report of suspected abuse or neglect that occurred outside Maryland regarding a victim who is currently a child and lives outside of Maryland, the [local department of social services] must forward the report to the appropriate agency outside of Maryland that is authorized to receive and investigate reports of suspected abuse.

> Promptly after receiving a report of suspected abuse or neglect that is alleged to have occurred outside of Maryland to a child victim who lives in Maryland, the [local department of social services] must forward the report to the appropriate agency outside of Maryland that is authorized to receive and investigate reports of suspected abuse or neglect. The [local department of social services] must cooperate to the extent requested with the investigating out-of-state agency. If determined appropriate by the [local department of social services], [it] must interview the child to assess whether the child is safe and provide services to the child and the child's family.

*Id.* at 2. Upon enactment of HB 550, these provisions, as summarized in the Fiscal Note, became new section 5–705.1

and new subsection 5–706(j), pertaining to out-of-state abuse and neglect, which we have discussed above.

Nothing in the history of events leading up to the passage of HB 550 or in the legislative history for the bill casts doubt upon the authority of a local department to which a report of suspected child abuse or neglect in Maryland is made to investigate the report, regardless of whether the victim resides in Maryland or outside Maryland. Indeed, HB 550 included a new "applicability" subsection (present section 5–703(b)), tracking, virtually word for word, the OAG's assessment, in the June 2002 Letter, of when subtitle 7 applies, and making plain that it applies to *any* instance of suspected child abuse or neglect in Maryland, without reference to where the victim lives.

Nevertheless, also as part of the 2003 enactment, section 5–706 was rewritten to insert, in several subsections, the language on which David's argument rests and that he maintains eliminated the previously existing authority of a local department to investigate a report of child abuse or neglect suspected to have happened in Maryland to a child not living in Maryland. Subsection (a), pre-amendment, directed the local department or law enforcement agency to conduct an investigation "[p]romptly after receiving a report of suspected abuse or neglect." The 2003 amendments changed that language to direct the local department or law enforcement agency to conduct an investigation "[p]romptly after receiving a report of suspected abuse or neglect of a child who lives in this State that is alleged to have occurred in this State." (New language in bold.) Likewise, in subsection (b), concerning the time frame for taking investigative action and the actions to be taken, the pre-amendment language directed the steps required

> [w]ithin 24 hours after receiving a report of suspected physical or sexual abuse and within 5 days after receiving a report of suspected neglect or suspected mental injury. . . .

After the 2003 amendments, that same portion of subsection (b) now directs the steps required

[w]ithin 24 hours after receiving a report of suspected physical or sexual abuse **of a child who lives in this State that is alleged to have occurred in this State,** and within 5 days after receiving a report of suspected neglect or suspected mental injury **of a child who lives in this State that is alleged to have occurred in this State** . . . .

(New language in bold.)

Finally, in subsection (i), entitled "Written report of findings," the pre-amendment language directed that, "[w]ithin 5 business days after completion of the investigation of suspected abuse, the local department . . . shall make a complete written report of its findings to the local State's Attorney." After the 2003 amendments, that same section now directs that, "[w]ithin 5 business days after completion of the investigation of suspected abuse **of a child who lives in this State that is alleged to have occurred in this State,** the local department . . . shall make a complete written report of its findings to the local State's Attorney." (New language in bold.)

### *Analysis*

David contends the amended language of section 5–706, mandating an investigation of a report of suspected abuse or neglect "of a child who lives in this State that is alleged to have occurred in this State," means that, for a local department to conduct an investigation, 1) the child victim must live in Maryland *and* 2) the alleged abuse or neglect must have happened in Maryland. In other words, both elements must be present and, if either is not, the authority to investigate does not arise. He maintains that the plain language of the critical phrase cannot be read otherwise.

David acknowledges that his reading of the critical phrase in section 5–706 results in a narrower investigative duty than is stated in section 5–703(b), which sets forth when subtitle 7 applies, and also was added to the subtitle by HB 550. As noted above, section 5–703(b) states that subtitle 7 applies to "suspected abuse or neglect that is alleged to have occurred in this State," without any qualification as to where the victim

lives. He argues, however, that the plain language of section 5-706 simply is more narrow than the application language in section 5-703(b), and the critical language would not have been added to section 5-706 if it were not the intention of the General Assembly to eliminate the power of a local department to investigate reports of suspected child abuse or neglect alleged to have occurred in Maryland to those reports in which the alleged victim was living in Maryland.

David further acknowledges that the logical result of his argument is that a local department, having received a report of suspected abuse or neglect of a child in Maryland, has no authority to investigate the report, and therefore cannot make any finding about the alleged abuse or neglect if the child victim does not live in Maryland. He asserts that his position not only is supported by the plain language of subsection 5-706 but also by the legislative history of that section and practical reasons why the General Assembly would not have wanted to impose upon a local department the burden of investigating allegations of abuse or neglect against a non-resident victim. He points out that a person who committed acts of child abuse or neglect in Maryland against a child who is not a resident of Maryland nevertheless could be criminally prosecuted for that conduct.

Finally, David asserts that, even if the new language in section 5-706(a) is ambiguous, a phrase in the purpose clause for HB 550 supports his view that it was the intention of the General Assembly in adding the new language in question to limit a local department's power to investigate to reports of child abuse or neglect perpetrated in Maryland against a child living in Maryland.

The Department responds that the critical language in section 5-706(a) is not plain, and indeed is ambiguous. In a single sentence not otherwise expounded upon, the Department argues that the language could be read to mean that an investigation is not required, but nevertheless is permitted, when the child victim lives outside of Maryland and the abuse or neglect took place in Maryland. The Department further

responds that, if the critical language is not ambiguous, it plainly was the product of a drafting error. Instead of stating that a duty to investigate arises "[p]romptly after receiving a report of suspect abuse or neglect **of a child who lives in this State that is alleged to have occurred in this State,**" the language should have been drafted to state that a duty to investigate arises, "[p]romptly after receiving a report of suspect abuse or neglect **of a child who lives in this State OR that is alleged to have occurred in this State....**" ("OR" added.) The critical phrase must be read in the disjunctive, the Department argues, for it to be consonant with other provisions of the statutory scheme.

Our decision in this case must be guided by the established law of statutory interpretation. The cardinal rule of statutory interpretation is to ascertain and effectuate legislative intent. *Johnson v. Mayor & City Council of Balt. City,* 387 Md. 1, 11, 874 A.2d 439 (2005). "A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny." *Lockshin v. Semsker,* 412 Md. 257, 274, 987 A.2d 18 (2010). Courts must construe statutes "in light of the declared legislative purpose, with the meaning of the plainest language being controlled by the context." *Guardian Life Ins. Co. v. Ins. Comm'r of Md.,* 293 Md. 629, 642, 446 A.2d 1140 (1982).

The Court of Appeals recently explained:

> To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the language of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with "forced or subtle interpretations" that limit or extend its application.

We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions.

In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.

*Lockshin,* 412 Md. at 275–77, 987 A.2d 18 (citations omitted).

█ If the statutory language alone is insufficient to allow us to discern the true legislative intent, we may resort to other recognized indicia, including:

[the statute's] title; how the statute relates to other laws; the legislative history, including the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it; the general purpose behind the

statute; and the relative rationality and legal effect of various competing constructions.

*Witte v. Azarian,* 369 Md. 518, 525–26, 801 A.2d 160 (2002).

█ The meaning of statutory language, and whether statutory language is ambiguous, are issues of law that we review *de novo.* *Himes Assocs., Ltd. v. Anderson,* 178 Md.App. 504, 534–35, 943 A.2d 30 (2008). Language is ambiguous when it reasonably can be understood to have two different meanings. *Deville v. State,* 383 Md. 217, 223, 858 A.2d 484 (2004).

We return to the language of section 5–706(a), which directs a local department or law enforcement agency to launch an investigation "[p]romptly after receiving a report of suspected abuse or neglect **of a child who lives in this State that is alleged to have occurred in this State.**" (Emphasis added.) We first must determine whether the emphasized language is ambiguous, *i.e.,* is its plain meaning evident or is it reasonably susceptible of two inconsistent but nonetheless rational meanings?

█ As the Court in *Lockshin* explained, in undertaking to interpret the meaning of a statute, we do not read the statutory language by itself. When the statute in question is part of a statutory scheme, "we analyze the statutory scheme as a whole." *Int'l Ass'n of Fire Fighters, Local 1715 v. Mayor & City Council of Cumberland,* 407 Md. 1, 962 A.2d 374 (2008). In *Gordon Family Partnership v. Gar On Jer,* 348 Md. 129, 138, 702 A.2d 753 (1997), the Court explained:

> Because it is part of the context, related statutes or a statutory scheme that fairly bears on the fundamental issue of legislative purpose or goal must also be considered. Thus, not only are we required to interpret the statute as a whole, but, if appropriate, in the context of the entire statutory scheme of which it is a part.

(Citations omitted.) In analyzing statutory language in the context of the scheme of which it is a part, we consider the " 'purpose, aim, or policy of the enacting body.' " *Serio v. Baltimore County,* 384 Md. 373, 390, 863 A.2d 952 (2004) (quoting *Drew v. First Guaranty Mort. Corp.,* 379 Md. 318,

327, 842 A.2d 1 (2003)). And we "attempt to harmonize provisions dealing with the same subject so that each may be given effect." *Kushell v. Dep't of Natural Res.*, 385 Md. 563, 577, 870 A.2d 186 (2005).

■ Determining whether statutory language is ambiguous is itself an exercise in statutory construction. Therefore, when the language in question is part of a greater statutory scheme, we decide ambiguity not only by examining the words of the statute themselves but also by viewing them together with the language of the other statutes in the scheme. *Lockshin, supra*, 412 Md. at 276, 987 A.2d 18; *see also Herlson v. RTS Residential Block 5, LLC*, 191 Md.App. 719, 735, 993 A.2d 699 (2010).

For the following reasons, we conclude that the meaning of the critical language that was added to section 5–706 in 2003 is ambiguous. The language reasonably can be read, as David reads it, to mean that a local department only can investigate a report of suspected child abuse or neglect when the conduct took place in Maryland **and** the victim is living in Maryland. In the context of the statutory scheme of which it is a part, however, the language reasonably can be read to mean that a local department has the authority to investigate such a report when the alleged abuse took place in Maryland **or** when the victim resides in Maryland.

The phrasing of section 5–706(a) is clumsy at best. Reduced to its essential language for our purposes, it says that a local department "shall" investigate a report of suspected abuse or neglect "[p]romptly after receiving a report of suspected abuse or neglect of a child who lives in this State that is alleged to have occurred in this State." The phrase "who lives in this State" reasonably can be read to modify "child" and the latter phrase "that is alleged to have occurred in this State" reasonably can be read to modify "suspected abuse or neglect," even though that phrase precedes the word "child." Although this reading of the pertinent language does not expressly include the word "and," its phrasing is such that conjunction is implied: the investigation that shall be under-

taken must be of a child who lives in Maryland *and* was abused or neglected in Maryland. As noted, this reading, which David advocates, is not unreasonable.

Unfortunately for David, however, a reading of the critical language in section 5–706 that mandates, in the conjunctive, that the reported conduct must have happened in Maryland and the child victim must live in Maryland is directly at odds both with the clearly phrased legislative policy in section 5–702 and the plain language of section 5–703, enunciating the "[s]cope and applicability" of subtitle 7.

Section 5–702 states generally that the purpose of subtitle 7 is "to protect children who have been the subject of abuse or neglect" and then lists five means, in the conjunctive, for doing so. Two of the five means of protection are "(1) mandating the reporting of any suspected abuse or neglect" and "(3) requiring prompt investigation *of each reported suspected incident of abuse or neglect . . . .*" (Emphasis added.) When used in this sense, as an adjective, the word "each" means "every one of two or more considered individually or one by one." RANDOM HOUSE DICTIONARY 612 (2nd ed.1987). According to David's reading of the critical phrase in section 5–706, however, not every report of suspected abuse or neglect would be investigated. Under the broadly worded reporting provisions of subtitle 7, a report of suspected abuse or neglect in Maryland of a child who is not living in Maryland is mandated. Yet, David's reading of section 5–706 would exclude those reports from investigation.

■ As we already have discussed, section 5–703(b), enacted as part of the 2003 amendments and delineating when subtitle 7 is applicable, encompasses "suspected abuse or neglect that is alleged to have occurred in this State," without any modification based on the victim's state of residency. It also encompasses—and only also encompasses—"suspected abuse or neglect of a child who lives in this State, regardless of where the suspected abuse or neglect is alleged to have occurred." This application of the subtitle to Maryland children abused anywhere *and* children abused or neglected in

Maryland plainly includes abuse or neglect perpetrated in Maryland of a non-Maryland child. David's proposed interpretation of the plain language of section 5–706, while rational, flies in the face of section 5–703(b), as it would exclude from investigation certain instances of alleged abuse or neglect in Maryland. The language at issue thus is ambiguous; so we are at liberty to use "all the resources and tools of statutory construction at our disposal" to determine its meaning. *Price v. State,* 378 Md. 378, 387, 835 A.2d 1221 (2003). Those tools include "legislative history, prior case law, and statutory purpose." *Deville, supra,* 383 Md. at 223, 858 A.2d 484.

 In resolving the ambiguity between David's interpretation of a local department's duty and power of investigation, under section 5–706, as requiring, in the conjunctive, a report of suspected abuse or neglect in Maryland, of a Maryland child, and the plain language of sections 5–702 and 5–703, requiring as a matter of policy and application, a prompt investigation, in the disjunctive, of a report of suspected abuse or neglect in Maryland *or* a report of suspected abuse or neglect of a Maryland child, we are guided by Court of Appeals precedent directly addressing such a "conjunctive versus disjunctive" ambiguity. That precedent has employed the canon of construction that says that language in the conjunctive may be read in the disjunctive, and *vice versa,* when necessary to effectuate the clear intention of the legislature.

 In *Reier v. State Department of Assessments and Taxation,* 397 Md. 2, 915 A.2d 970 (2007), the Court explained this canon of statutory construction as follows:

> While it is true that "or" is read typically as a disjunctive, such is not always the case.
>
> The term "or" may be read in the conjunctive when the context reasonably supports the inference that such a construction is necessary to effectuate the intent of the Legislature. We have stated previously that "[i]t is well settled that the terms 'and' and 'or' may be used interchangeably when it is reasonable and logical to do so." *Little Store,*

*Inc. v. State,* 295 Md. 158, 163, 453 A.2d 1215, 1218 (1983); *see also Comptroller v. Fairchild Indus., Inc.,* 303 Md. 280, 286, 493 A.2d 341, 344 (1985) (stating that courts have the authority to construe the word "and" to mean "or" as required by context in order to comply with the clear legislative intent); NORMAN J. SINGER, 1A SUTHER-LAND STATUTES AND STATUTORY CONSTRUC-TION, § 21:14 (6th ed.2002).

*Id.* at 31–32, 915 A.2d 970 (some citations omitted). The canon is well-established, having been applied by the United States Supreme Court over 150 years ago in interpreting the jurisdiction conferred by a statute that subjected property used in aid of the Confederacy in the Civil War, with consent of the owner, to be confiscated and condemned by the government. *Union Ins. v. United States,* 73 U.S. 759, 764, 6 Wall. 759, 18 L.Ed. 879 (1867) (stating, "[W]hen we look beyond the mere words to the obvious intent we cannot help seeing that the word 'or' must be taken conjunctively; and that the sense of the law is that both the Circuit and the District Courts shall have jurisdiction 'according to the amount' *and* 'in admiralty.' ") (quoting the Act of August 6th, 1861 (emphasis in original)).

▮▮ We hold that the critical phrase in section 5–706(a), which is ambiguous, means that a local department shall promptly investigate a report of suspected child abuse or neglect it receives 1) of a child who lives in Maryland *or* 2) of abuse or neglect suspected to have occurred in Maryland. A reading of the statutory language to require the conjunctive— that the duty to investigate arises only when the child victim lives in Maryland *and* the abuse or neglect is suspected to have taken place in Maryland—is contrary to the clear intention of the legislature when it enacted the 2003 amendments that included section 5–706.

As noted, the policy section of the subtitle (5–702) plainly requires that action be taken on *all* reports of suspected child abuse or neglect received by local departments. A reading of the critical language of section 5–706 in the conjunctive, as

David advocates, would mean that action in the form of an investigation is required for a report of a child living in Maryland who is thought to have been abused in Maryland and for a child living in Maryland who is thought to have been abused outside of Maryland; and in the form of forwarding the report to the proper out-of-state investigative authorities for a child living out of state who is thought to have been abused out of state. But, for a child not living in Maryland who is thought to have been abused in Maryland, no action would be required (and as David argues, no action would be permitted). Such a report simply would lie dormant notwithstanding that the application section of the subtitle (5–703(b)) covers child abuse or neglect in Maryland *without any limitation on the residency of the child.*

Only a reading of the statutory language in the disjunctive, so as to require an investigation of a report of suspected abuse or neglect of a child who lives in Maryland *or* is alleged to have been abused or neglected in Maryland, would fulfill the clear intention of the legislature that action be taken on all reports of suspected child abuse or neglect and that investigations be undertaken of all allegations of acts of child abuse or neglect in Maryland. This conclusion is buttressed by the legislative history of section 5–706, which we have discussed at length. The purpose of the 2003 amendments was to fill the statutory action gap that Attorney General Curran foresaw in 1991 for instances of abuse or neglect happening outside Maryland but having some connection to Maryland. The revamped law closed the gap by expanding the reporting obligations to cover instances of child abuse or neglect suspected to have happened outside Maryland to out-of-state victims but brought to the attention of Maryland mandated reporters (section 5–705.1), and by making clear that investigations of reports of abuse perpetrated out of state against Maryland residents are to be forwarded to the appropriate out-of-state agencies.

David argues, nevertheless, that the purpose clause of HB 550 supports his assertion that the legislature intentionally amended section 5–706 to limit the circumstances in which

local departments must investigate reports of suspected abuse or neglect to those in which the acts took place in Maryland and the victim is a resident of Maryland. The purpose clause states:

> FOR the purpose of requiring the reporting of certain out-of-state child abuse and neglect under certain circumstances; specifying the procedures for the reporting of certain out-of-state child abuse and neglect; requiring a local department of social services to forward a report of certain out-of-state child abuse or neglect to a certain out-of-state agency under certain circumstances; specifying the applicability of certain provisions of law; establishing that certain reporting requirements apply only to certain persons in this State; providing certain immunity for certain persons under certain circumstances; *establishing that certain investigation procedures apply only to certain in-state child abuse or neglect;* requiring a local department that receives a report concerning certain child abuse or neglect to take certain actions; making certain clarifying and conforming changes; defining a certain term; and generally relating to child abuse and neglect.

(Emphasis added.) According to David, the portion of the purpose clause we have italicized shows that investigations required by section 5–706 only apply to child victims who live in Maryland.

The purpose clause language David points to does not support his argument. The language concerns in-state child abuse or neglect, *i.e.*, acts of child abuse or neglect alleged to have happened in the state of Maryland. Specifically, it gives as one purpose of the bill the establishment of certain investigatory procedures that apply to certain reports of in-state child abuse and neglect; it does not state or in any way imply that its purpose is to limit the authority of a local department to investigate in-state child abuse or neglect of out-of-state children.

Finally, David argues that, because the general purpose of the Maryland child abuse and neglect reporting and investiga-

tion statutes—to protect children in Maryland—is not being fulfilled when a child victim is not a resident of Maryland, section 5–706 should not be read to include such children; moreover, there will be practical difficulties in conducting investigations of children located out of state. Again, we disagree.

Reading section 5–706 to require investigations of reports of abuse or neglect in Maryland of any child *and* reports of abuse or neglect of any child who is a Maryland resident, wherever the acts occurred, advances the purpose of protection of children in this State. In the first instance, the offending acts took place in Maryland; in the second, the child lives in Maryland. Moreover, for purposes of section 5–706, the offender and the child will have had an ongoing relationship, either involving custody or supervision of the child by the offender, or as members of the same household or, as here, the same family; and that relationship will have resulted in the child, wherever living, being abused or neglected in this State or will have resulted in a Maryland child being abused or neglected, wherever the acts were perpetrated. In either situation, the abused or neglected child will have had, and may still have, a connection to the State of Maryland that means investigation of the reported conduct will advance the protection of children in Maryland against abuse and neglect and is likely to ameliorate any practical difficulties in conducting an investigation when the child lives out of state.

For all these reasons, we hold that a Maryland local department of social services has authority, under FL section 5–706, to investigate a report of suspected abuse or neglect of a child in Maryland, even though the child lives outside of Maryland, and indeed is required by the language of that statute to do so.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**