WOODALL, Justice.
Morgan Keegan & Company, Inc., and Regions Financial Corporation (hereinafter referred to collectively as “Regions”), and Jay Higgenbotham, an investment officer of Regions, appeal from a judgment entered on a jury verdict, awarding $10,000 compensatory damages and $50,000 punitive damages in an action by Patricia Cunningham and her son, Judge Preston Cunningham III (“Preston”), against Regions and Higgenbotham for improperly withholding federal income taxes on their investment account. Regions explains the relationship between the corporate entities as follows:
“Regions Investment Company, Inc., merged with Morgan Keegan & Company, Inc., in April of 2001. Morgan Kee-gan & Company, Inc., was the surviving entity. Prior to the merger, Regions Financial Corporation was the parent company of Regions Investment Company, Inc. Upon the merger, Regions Financial Corporation became the parent company of the surviving entity, Morgan Keegan & Company, Inc.”
Regions’ brief, at 4 n. 1. We affirm in part, reverse in part, and remand.
*899 The facts underlying this dispute began with a discussion between Patricia Cunningham and Higgenbotham in the summer of 2000 regarding investment opportunities provided by Regions. Later, on September 5, 2000, Patricia Cunningham purchased 2,655.337 shares in a mutual fund managed by Regions, namely, a “Regions Aggressive Growth Fund — B” (“the growth fund”), for $50,000.[1] This purchase resulted in the opening of a joint account in the names of Patricia and Preston. The Cunninghams’ decision to open the joint account was communicated to Regions by telephone. Consequently, the Cunning-hams did not sign any documents in connection with opening the account.
Procedures for the opening of accounts such as the Cunninghams’ were set out in a manual entitled “Regions Investment Company, Inc., Compliance with Supervisory Procedures” (“the manual”). In particular, the manual stated, “Prior to the entry of an initial order, the registered representative must obtain a completely executed New Account [Application] Form, duly signed.” (Emphasis added.) The “New Account Application Form” (“the new account form”) contained a section that stated, in pertinent part:
“Certification. — Under penalties of perjury, I certify that
“1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me).
“2. I am not subject to backup withholding, and
“3. .A copy of Form W-9 Instructions has been provided.
“Certification instructions. — You must cross out item (2) above if you have been notified by IRS that you are currently subject to backup withholding because of underreporting interest or dividends on your tax return.”
(Emphasis added.)
Backup withholding tax has been explained as follows:
“[Backup withholding is] [t]ax withheld from investment income, such as interest and dividends, to ensure that tax is collected on the income. Banks and other organizations are required to report to the IRS all interest and dividend payments you received, along with your Social Security number or other taxpayer identification number. If you don’t give them correct reporting information for you, they are required to withhold SI percent of your investment income. The IRS may also require the bank or other organization to withhold tax if it determines you have underreported your investment income. If backup withholding is taken out of your earnings, it will show up as ‘Federal income tax withheld’ on the Form 1099-INT or Form 1099-DIV that the bank sends you each January.”
(On the date this opinion was released this information could be found at Definitions of Tax Terms: B-C, at www.bankrate.com /wsjr/itax/edit/ definitions/ definitions_tax-es2.asp (on file in the office of the clerk of the Supreme Court)(emphasis added).) The Cunninghams never completed or executed a new account form.
By December. 2000, the value of the Cunninghams’ investment had decreased to approximately $47,000. However, at that time, Higgenbotham learned that the growth fund was going to declare a 22 per cent taxable gain for the year 2000. The gain was based on the performance of the growth fund in the first three quarters of *900 2000, that is, before the Cunninghams had purchased their shares of the growth fund. Consequently, the Cunninghams were about to incur a taxable capital gain of approximately $10,000, even though the value of their shares had declined.
In December 2000, Higgenbotham informed the Cunninghams, and 10 to 20 other customers similarly situated, of their impending tax liability and advised them to transfer their investment temporarily from the growth fund to a “Regions treasury money market fund” (“the money market fund”). The Cunninghams accepted Higgenbotham’s advice, and, on December 15, 2000, sold the 2,655.337 shares of the growth fund in order to transfer $46,627.72 from the growth fund to the money market fund. However, because Regions did not have an executed new account form on record as a basis for avoiding backup withholding, that transaction triggered a computer-generated 31 percent backup-withholding payment of $14,454.59, which Regions sent to the Internal Revenue Service (“the IRS”).
Regions sent the Cunninghams a transaction confirmation showing the sale of 1,832.183 shares of the growth fund and a transfer of the sales proceeds of $32,173.13 to the money market fund. The remaining 823.154 shares of the growth fund were sold, and the proceeds of $14,454.59 were used to pay the backup withholding (hereinafter referred to as “the first withholding”).
Inexplicably, the first withholding was followed five days later by a redundant second backup-withholding payment of $9,973.67 (calculated as follows: $46,-627.72 — $14,454.59 = $32,173.13 x 31%) (“the second withholding”). It is undisputed that Regions received no compensation or gain from either withholding. After the first withholding and the second withholding, approximately $22,000 remained in the Cunninghams’ account.
Regions sent a four-page account statement to the Cunninghams for the year 2000 (“the year-end summary”). That statement purported to represent the “total portfolio” value as the sum of the “market value/market price” of three categories: (1) $32,220.32 in a “Regions treasury money market fund”; (2) $11,532.39 in a “Regions aggressive growth fund”; and (3) $32,173.13 in a second “Regions treasury money market fund”; for a “total portfolio” value of $75,925.84. It is undisputed that the statement was “misleading” and that the “true market value” of the portfolio was approximately $22,000. However, in the “Transactions/Activity Detail” section, the year-end summary revealed that only $32,173.13 had been removed from the growth fund and placed in the money market fund.[2]
The year-end summary also listed the second withholding as “Regions Aggressive Growth Fund 31% Withholding Non-Certified T[axpayer] Identification] N[umber],” in the amount of a $9,973.67 charge. The second withholding appeared on the year-end summary as a negative cash transaction. Moreover, it showed the net of the transactions for the year. Specifically, it showed the “Total Amounts Credited” ($114,414.65), as opposed to the “Total Amounts Charged” ($92,146.80), for a net of $22,267.85 in the account. Finally, two Form 1099 statements were sent to the Cunninghams in January 2001, each one describing one of the two withholding payments.
*901 Regions sent the Cunninghams monthly statements on essentially the same format as the year-end summary. However, after the merger of Regions Investment Company, Inc., and Morgan Keegan & Company, Inc., in April 2001, the format of the monthly statements changed. The statement for the month of May 2001, for the first time, expressly showed a “bottom-line” “Market Value” of the money market fund. The bottom line of the Cunning-hams’ account was $22,378.45. Subsequent monthly statements were similarly revealing.
In September or October 2001, Patricia “discovered” in a conversation with Andrew Fort, Higgenbotham’s assistant, that her account balance was approximately $22,000, and she expressed concern. Fort and Higgenbotham investigated her inquiry and discovered the two withholding payments. They acknowledged that the payments had been erroneously made, but they told Patricia that Regions could not merely refund the money because it had already been sent to the IRS. They advised her to request a refund from the IRS on her tax return. Pursuant to the Cun-ninghams’ requests of the IRS, the Cun-ninghams received tax refunds in the following two years totaling $24,856.[3] The Cunninghams sold their shares in the money market fund in October 2003.
Meanwhile, on December 10, 2002, the Cunninghams sued Regions and Higgen-botham. They averred that “the proceeds of their investments” were “wrongfully and without reason transferred to the U[nited] S[tates] government,” and that they were “caused to report excessive amounts of taxable income,” and that they “paid taxes on such amounts.” The Cunninghams sought relief on claims of fraud, suppression, conversion, breach of contract, and violation of the Alabama Securities Act, Ala.Code 1975, § 8-6-1 et seq.
The case was tried to a jury in March 2004. At the close of all the evidence, Regions moved for a judgment as a matter of law (“JML”), challenging the sufficiency of the evidence as to all the claims. The jury returned a general verdict, awarding the Cunninghams $10,000 in compensatory damages. Additionally, it assessed $50,000 punitive damages against Regions. Regions and Higgenbotham filed a post-judgment motion for a JML, which, in the alternative, sought a remittitur of the punitive damages or a new trial. In that motion, Regions and Higgenbotham argued that the Cunninghams had failed to present substantial evidence of their claims and incorporated by reference the arguments presented in their prejudgment JML motion. The postjudgment motion specifically challenged the sufficiency of the evidence of conduct on the part of Regions that would support an award of punitive damages. The trial court denied that motion. Also, pursuant to a motion filed by the Cunninghams based on Ala.Code 1975, § 8 — 6—19(a)(2), the trial court awarded the Cunninghams’ counsel “a fee and reimbursement of expenses in the amount of $46,766.53.” Regions and Higgenbotham appealed.
On appeal, Regions and Higgenbotham accept their liability for the compensatory damages awarded by the jury. Regions’ brief, at 28. However, Regions challenges the assessment of punitive damages against it, and Regions and Higgenbotham challenge the award of an attorney fee.

I. Punitive Damages

Regions contends that the evidence was insufficient to support any award of puni *902 tive damages. Thus, it argues, the trial court erred “in not setting aside the award.” Regions’ brief, at 30. We agree.
“Punitive damages must be supported by clear and convincing evidence ‘that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff.’ § 6-ll-20(a), Ala.Code 1975. Section 6 — 11—20(b) defines the terms ‘fraud,’ ‘malice,’ ‘wantonness,’ and ‘oppression’:
“ ‘(1) Fraud. An intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury.
“ ‘(2) Malice. The intentional doing of a wrongful act without just cause or excuse, either:
“ ‘a. With an intent to injure the person or property of another person or entity, or
“ ‘b. Under such circumstances that the law will imply an evil intent.
“ ‘(3) Wantonness. Conduct which is carried on with a reckless or conscious disregard of the rights or safety of others.
“ ‘(5) Oppression. Subjecting a person to cruel and unjust hardship in conscious disregard of that person’s rights.’
“ ‘ “Gross” is defined as inexcusable, flagrant, or shameful.’ Talent Tree Personnel Services, Inc. v. Fleenor, 703 So.2d 917, 924 (Ala.1997).”
Ex parte Liberty Nat’l Life Ins. Co., 797 So.2d 457, 466-67 (Ala.2001) (emphasis added). “ ‘ “[Pjunitive damages [in an action for conversion] are justified when the evidence discloses the conversion to have been committed in known violation of law and of owner’s rights, with circumstances of insult, or contumely, or malice.” ’ ” Industrial Techs., Inc. v. Jacobs Bank, 872 So.2d 819, 826 (Ala.2003) (quoting Roberson v. Ammons, 477 So.2d 957, 961 (Ala.1985)).
“Clear and convincing evidence” is “[evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.” Section 6-11-20(b)(4), Ala.Code 1975. “Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.” Id.
The essence of the Cunninghams’ claims is that Regions wrongfully caused, or effected, the two withholdings and then fraudulently suppressed the fact that the withholdings had occurred. In that connection, the Cunninghams state:
“The evidence ... showed a string of fraudulent and unjustified conduct, including suppression by Higgenbotham of the danger of not getting a backup withholding certificate signed, ... suppression that the first sale in the account would result in a backup withholding, suppression that the December 15 transactions resulted in backup withholding, false and misleading statements in the confirmations on the December 15 transactions, [and] false statements and misleading statements in the account statements for December of 2000 that did not report the withholding transactions.... ”
*903 Cunninghams’ brief, at 29-30 (emphasis added).
At the bottom of the Cunninghams’ claims against Regions is the failure of Regions’ “registered representatives,” Higgenbotham and Fort, to ensure that the Cunninghams signed a new account form as required by the manual. It is axiomatic, however, that the mere failure of an agent or employee to follow a manual or procedures outlined by the employer will not authorize an award of punitive damages. Were it otherwise, punitive damages might be awarded on the basis of simple negligence, contrary to well-established Alabama law. CP & B Enters., Inc. v. Mellert, 7,62 So.2d 356, 362 (Ala.2000) (simple negligence will “not warrant an award of punitive damages”); Tuscaloosa County v. Barnett, 562 So.2d 166, 169 (Ala.1990); Montgomery City Lines v. Davis, 261 Ala. 491, 494-95, 74 So.2d 923, 925-26 (1954); Bradley v. Walker, 207 Ala. 701, 703, 93 So. 634, 635 (1922); see also Daniels v. Mead Coated Bd., Inc., 858 F.Supp. 1103, 1111 (M.D.Ala.1994) (“The failure to follow company policy may be prima facie evidence of negligence.... ”).
To warrant punitive damages under the suppression or conversion claim, the Cunninghams must present evidence indicating that Higgenbotham or Fort deliberately suppressed from the Cunning-hams the necessity of executing a new account form, with the “intention ... of thereby depriving [the Cunninghams] of property,” § 6 — 11—20(b)(1) (emphasis added), or “ ‘ “in known violation of law and of [the Cunninghams’] rights, with circumstances of insult, or contumely, or malice.” ’ ” Jacobs Bank, 872 So.2d at 826 (quoting Roberson, 477 So.2d at 961)(em-phasis added). There is no clear and convincing evidence indicating that Higgen-botham or Fort possessed such intent or knowledge.
On the contrary, the Cunninghams concede that Higgenbotham did not know that Regions did not have a new account form on file for their account. Cunninghams’ brief, at 11. The Cunninghams state that Regions customarily allowed “the operations New Account area to ... open[ ] mutual fund accounts without signed New Account Forms.... The practice was'that the New Account area, not the Registered Representative, would mail, without documentation, the New Account Form to the new customer [for signature and return].” Id. The Cunninghams allege that they never received a new account form, but they also say that “Higgenbotham was never advised by the New Account Area that [their] form had not been received.” Id. (emphasis added).
To be sure, someone at Regions — presumably someone in the new account area — knew that Regions had no new account form on file for the Cunninghams. However, the most the evidence shows is that Regions’ customary procedures were not followed in this case because of a lack of communication between personnel in the new account area and the registered representatives, Higgenbotham and Fort. Indeed, the Cunninghams place the responsibility for the two withholdings squarely upon the shoulders of Higgenbotham and Fort. Specifically, they state: “The evidence showed that Regions ... failed miserably to conduct the most basic aspects of its business — to get a New Account Form signed. The Manual placed that responsibility directly upon the Registered Representative^].” Cunninghams’ brief, at 37. It was that “simple disobedience to the Manual,” the Cunninghams insist, that “caused [their] economic damage.” Id. (emphasis added).
“[S]imple disobedience to the Manual,” as we pointed out earlier in this opinion, although it arguably constitutes substan *904 tial evidence of negligence, does not provide a basis for the punitive damages awarded in this case. Under the Cunning-hams’ theory of the case, the facts could not “produce in the mind of the trier of fact a firm conviction ” as to the element of intent and deliberation required for a punitive-damages award, “and a high probability as to the correctness of that conclusion.” Section 6-ll-20(b)(4) (emphasis added). Thus, there was no basis for an award of punitive damages on the conversion and suppression claims.
The Cunninghams’ fraud claims fare no better. Those claims are based on the allegedly “false and misleading statements in the [transaction confirmation], [and] false statements and misleading statements in the [year-end summary] that did not report the withholding transactions.” Cunninghams’ brief, at 30. For those statements to form the basis of a punitive-damages award, there must have been clear and convincing evidence that the confirmation or the year-end summary contained a material fact Regions “intentional[ly] misrepresented] ... with the intention ... of thereby depriving [the Cun-ninghams] of property or legal rights or otherwise causing injury.” Section 6 — 11— 20(b)(1).
Regions concedes that the year-end summary overstated the tbtal value of the Cunninghams’ portfolio. However, the year-end summary also accurately reflected the “Total Amounts Credited” and the “Total Amounts Charged,” from which the balance of the account — $22,267.85— could be calculated. Moreover, the year-end summary revealed, albeit somewhat indirectly, both the first withholding and the second withholding. It showed that only $32,173.13 had been transferred to the money market fund from the growth fund, rather than the $46,627.72 the Cun-ninghams would have expected to have been transferred. Similarly, it showed the transfer of only 1,832.183 shares, rather than the 2,655.337 shares the Cunning-hams would have expected to have been transferred. The year-end summary also specifically revealed that $9,973.67, the precise, amount of the second withholding, had been charged to the Cunninghams’ account on December 19, 2000.
Although the year-end summary contained some confusing and inaccurate information, it, along with the Form 1099s, would have placed even unsophisticated investors on inquiry notice of peculiar, ostensibly unauthorized, transactions in their account. Thus, to the extent that, as the Cunninghams contend, intent to deceive may be evidenced by the year-end summary, the evidence is not clear and convincing.
Evidence of intent inferable from the transaction confirmation is no more convincing. .The transaction confirmation shows the sale of 1,832.183 shares of “Regions Aggressive. Growth Fund” stock at $17.56 per share, and the deposit of $32,173.13 in the “Regions treasury money market fund,” when the sale of 2,655.337 shares and deposit of $46,627.72 was expected. Regions can hardly have anticipated that the unaccounted-for $14,454.59 would go unnoticed by the Cunninghams.
In that connection, the Cunninghams fail to state how the information omitted from, or misstated in, the transaction confirmation and the year-end summary damaged them or benefited Regions. They do not argue that they relied on the information to their detriment. Indeed, they do not explain the relevancy of the “false and misleading statements” of which they complain.
Moreover, it is undisputed that Regions received no fee or commission, either from the transfer of funds from the growth fund *905 to the money market fund or from the two withholdings that resulted from that transaction. The only entity that benefited from the withholdings was the IRS. Nor do the Cunninghams contend that Higgen-botham, Fort, or anyone else at Regions was motivated by malice or ill will, The absence of any articulable or plausible motive for the Cunninghams’ claims of fraud, suppression, and conversion undercuts the basis for the punitive-damages award.
Because the award is not supported by clear and convincing evidence of conduct that would authorize a punitive-damages award, the trial court erred in denying Regions’ postjudgment motion for a JML on that issue. To that extent, the judgment is reversed.

II. Attorney Fee

Regions contends that the trial court erred in awarding the Cunninghams an attorney fee, pursuant to § 8-6-19(a)(2).[4] It frames the issue as follows: “Under the facts of this case, the Alabama Securities Act does not provide a ground for an attorney’s fee award.” Regions’ brief, at 53. Because Regions now “accepts its liability for compensatory damages as awarded by the jury,” Regions’ brief, at 28, it necessarily does not contend that it was entitled to a JML on the claims submitted to the jury. In other words, it does not contend that there was no substantial evidence to support those claims. Additionally, it states: “Regions is not challenging the jury’s' interpretation of the Act for purposes of a violation. It is challenging the court’s interpretation of the Act for purposes of awarding attorney’s fees.” Reply brief, at 19 (emphasis added).
Similarly, Regions does not ask this Court to reverse the judgment and remand the cause for the entry of a JML on the Cunninghams’ claims of breach of contract, conversion, fraud, suppression, and violation of the Alabama Securities Act. Instead, Regions specifically asks this Court only to “reverse the trial court’s judgment entering the punitive damages verdict, reverse the trial court’s denial of Regions’ motion for a new trial or for remittitur and reverse the trial court’s order granting the Cunninghams’ motion for an award of attorney fees.” Regions’ brief, at 67 (emphasis added). Regions does not contend that the claim alleging a violation of the Alabama Securities Act was a “bad count” that should not have gone to the jury, thereby necessitating a new trial under the rule established by Aspinwall v. Gowens, 405 So.2d 134 (Ala.1981). Consequently, we deem the statutory claim to be unchallenged “for purposes of a violation.” Therefore, we limit our review to the legal issue whether the violation of the Alabama Securities Act supported an award of an attorney fee.
Section 8-6-19(a) provides, in pertinent part:
“(a) Any person who:
“(1) Sells or offers to sell a security in violation of any provision of this article or of any rule or order imposed under this article or of any condition imposed under this article, or
“(2) Sells or offers to sell a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made ... not misleading, ...
“is liable to the person buying the security from him who may bring an action to recover the consideration paid for the security, together with interest at six percent per year from the date of pay *906 ment, court costs and reasonable attorneys’ fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition.”
Regions argues:
“The Alabama Securities Act permits two specific forms of recovery and then only in the alternative: rescission with interest, costs and attorneys’ fees, or, ‘if he no longer owns the security,’ damages. ... At trial the Cunninghams no longer owned any of [the] securities involved in this case. Therefore, even assuming they established a violation of the Act, they could only recover ‘damages,’ and not rescission with interest and attorneys’ fees. Under the clearly expressed, plain language of the Act, attorneys’ fees are not available when the buyer no longer owns the security.”
Regions’ brief, at 54-55 (emphasis added) (citations to the record omitted). In Regions’ view, the Legislature’s failure to repeat the attorney-fee provision after the “damages” clause is dispositive of the issue.
The Cunninghams contend that “attorneys fees are included in ‘the amount that would be recoverable upon a tender’ ... whether she has sold the security or not.” Cunninghams’ brief, at 40 (emphasis added). We agree with the Cunninghams.
Section 8-6-19(a)(2) was modeled after the Uniform Securities Act § 410(a)(2), 7C U.L.A. (1956), before the 1958 amendments to the Uniform Act. Banton v. Hackney, 557 So.2d 807, 826 (Ala.1989). “When a statute is based on a uniform act, we assume that the legislature ‘intended to adopt the construction placed on the act by its drafters.’ ” In re Estate of Dobert, 192 Ariz. 248, 252, 963 P.2d 327, 331 (Ariz.Ct.App.1998) (quoting State v. Sanchez, 174 Ariz. 44, 47, 846 P.2d 857, 860 (Ariz.Ct.App.1993)). “Thus, commentary to such a uniform act is ‘highly persuasive unless erroneous or contrary to settled policy in this state.’ ” Id. See also Universal Motors, Inc. v. Neary, 984 P.2d 515, 517 (Alaska 1999); In re Nocita, 914 S.W.2d 358, 359 (Mo.1996); 2B Norman Singer, Statutes and Statutory Construction § 52:05 (6th ed.2000).
Before the 1958 amendment, § 410(a)(2) defined damages as “ ‘the amount that would be recoverable upon tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition.’ ” 12A Joseph C. Long, Blue Sky Law § 9:15 (2004) (quoting pre-amendment § 410(a)(2)). Neither the original version nor the amended version of § 410(a)(2) repeated the attorney-fee provision after the “damages” clause. Nevertheless, the comments to the amended version point out that “[t]he measure of damages, when the plaintiff is not in a position to tender back the security, is the same under Clauses (1) and (2). It is designed to be the substantial equivalent of rescission.” Uniform Securities Act § 410 (as amended), comment (emphasis added). See White v. Sanders, 650 F.2d 627, 631 (5th Cir.1981) (section 8-6-19(a) provides a “rescission-type remedy”); Blue Sky Law, supra, § 9:13 n. 11 (“If the security has been sold, then [§ 410] provides the investor with statutory rescissionary damages. The measure of these damages is the difference between the purchase price the investor paid for the security and the price at which it was sold, plus interest, attorneys’ fees, and costs.”).
*907 Moreover, when the Uniform Securities Act of 1956 was superseded by another uniform act in 1985, § 410(a)(2) was replaced by § 605(a), which clearly answers the question presented here. Specifically, § 605(a) provides, in pertinent part:
“Upon tender of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of this State from the date of payment, costs, and reasonable attorney’s fees as determined by the court, less the amount of income received on the security.... A purchaser who no longer owns the security may recover damages. Damages are the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of this State from the date of disposition of the security, costs, and reasonable attorney’s fees determined by the court.”
Uniform Securities Act § 605(a), 7C U.L.A. (1985) (emphasis added). Section 605 thus expressly states that purchasers, such as the Cunninghams, who have sold their securities at the time of trial, may, nevertheless, recover attorney fees in the same manner as purchasers who have retained their securities.
It is important to note that § 605(a) was “not intended to alter significantly [the provisions of § 4.10(a)(2), which it superseded ].” § 605, comment 1 (emphasis added). It is clear, therefore, that, although original § 410(a), like its Alabama counterpart, did not reiterate the attorney-fee clause after the “damages” clause, it did, nevertheless, permit the recovery of attorney fees by purchasers in the position of the Cunninghams. See Blue Sky Law, supra, § 9:13 n. 11.
We see no indication that the Alabama Legislature intended a result different from the one provided by the uniform acts. It did not intend to place purchasers on an unequal footing with respect to attorney fees, depending on whether they held their securities at the time of trial. We conclude, therefore, that the trial court did not err in awarding an attorney fee.[5]

III. Summary

In summary, the trial court erred only in denying Regions’ motion for a JML as to punitive damages. That portion of the judgment awarding punitive damages is, therefore, reversed and the cause is remanded for the entry of an appropriate order. In all other respects, the judgment is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
NABERS, C.J., and SEE, LYONS, and PARKER, JJ., concur.
SMITH, J., recuses herself.

. The money used to purchase the shares was the proceeds of a life insurance policy Patricia had collected upon the death of her husband, Judge Preston Cunningham, Jr.

. That amount, of course, corresponded precisely with the amount remaining after the first withholding.

. The amount withheld by Regions and forwarded to the IRS was $24,428.26 ($14,-454.59 + $9,973.67 = $24,428.26).

. Higgenbotham, through the same counsel and in the same brief, makes the same arguments as Regions in support of this contention.

. Regions and Higgenbotham do not challenge the manner in which the fee was calculated.