*Scarbrough v. Transplant Resource Center of Maryland*, No. 815, September Term, 2018. Opinion by Fader, C.J.

**MARYLAND REVISED UNIFORM ANATOMICAL GIFT ACT AND HEALTH-GENERAL ARTICLE SECTION 19-310 – GOOD FAITH IMMUNITY – ORGAN PROCUREMENT ORGANIZATIONS**

The Maryland Revised Uniform Anatomical Gift Act and § 19-310 of the Health-General Article confer immunity on organ procurement organizations for good faith actions taken to recover a donated organ for transplant, including packaging, preserving, and transporting the organ.

**MOTION TO DISMISS – ABSENCE OF FACTUAL DISPUTE**

The circuit court properly granted the motion to dismiss claims against an organ procurement organization where (1) the court correctly interpreted the immunity provisions of the Maryland Revised Uniform Anatomical Gift Act and Section 19-310 of the Health-General Article to apply to an organ procurement organization's good faith actions related to recovering an organ for transplant and (2) the complaint did not allege that the organ procurement organization or its employees did not act in good faith.

Circuit Court for Baltimore City
Case No. 24-C-18-000148

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 815

September Term, 2018

_____

KAREN D. SCARBROUGH

v.

TRANSPLANT RESOURCE CENTER OF
MARYLAND

_____

Fader, C.J.,
Graeff,
Eyler, James R.,
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Fader, C.J.

_____

Filed: August 29, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

We are asked to decide whether two Maryland statutes that provide immunity for certain actions related to the recovery and donation of organs apply to an organ procurement organization's conduct in recovering organs for transplantation. The appellant, Karen Scarbrough, alleges that the appellee, Transplant Resource Center of Maryland, through two of its employees, negligently packaged, preserved, and transported a kidney intended for her. The Circuit Court for Baltimore City dismissed Ms. Scarbrough's complaint on the ground that Transplant Resource Center enjoys good faith immunity from suit. Ms. Scarbrough contends that the circuit court erred in dismissing her suit because the statutory immunity does not extend to conduct that occurs after an organ is removed from the donor. Because we agree with the circuit court's interpretation of the scope of the immunity, we will affirm.

## BACKGROUND[1]

Transplant Resource Center is an organ procurement organization that harvests, preserves, packages, and transports donated organs to hospitals around the United States for transplantation. In June 2014, Ms. Scarbrough was on the waitlist for a kidney transplant at the University of Alabama-Birmingham Hospital (the "Hospital") when two employees of Transplant Resource Center, Dennis Edwards and Peter Quackenbush, "harvested, received, collected, handled, preserved and/or packaged" a kidney from a

---

[1] Because we are reviewing the grant of a motion to dismiss, we assume the facts to be as presented in Ms. Scarbrough's complaint. *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 121 (2007).

deceased donor at University of Maryland Medical Center.  Transplant Resource Center gave the donated kidney to a courier service that transported it to the Hospital.

The day after the kidney was removed, the Hospital informed Ms. Scarbrough that it was available for transplant.  She traveled from her home in Florida to the Hospital, where she was prepared for surgery.  Upon receiving and examining the donated kidney, however, Hospital staff observed that it "was hard and cold to the touch, with patchy discoloration that appeared to resemble 'freezer burn,'" and determined that it was not suitable for transplant.  The Hospital canceled Ms. Scarbrough's transplant surgery.

Ms. Scarbrough sued Transplant Resource Center and Messrs. Edwards and Quackenbush (collectively, "Transplant Resource Center") for negligence, seeking recovery for "both mental and physical" injuries as well as "the economic losses suffered . . . as a result of the negligence . . . ."  She asserted that the defendants "were negligent with respect to the collection, packaging, preservation, transportation, and/or handling of the donated kidney," which resulted in "irreversible damage" to the kidney making it unsuitable for transplant.  Ms. Scarbrough included with her complaint a letter from Dr. Kristin Mekeel, who wrote that it was her "opinion to a reasonable degree of medical certainty that in this case the kidney was improperly packaged . . . ."  Ms. Scarbrough did not allege that any of the defendants acted in bad faith.

Transplant Resource Center moved to dismiss the suit on the ground that it enjoys good faith immunity under both § 19-310 of the Health-General Article (Repl. 2015) and the Maryland Revised Uniform Anatomical Gift Act, §§ 4-501 – 522 of the Estates & Trusts Article (Repl. 2017; Supp. 2018) (the "Anatomical Gift Act" or the "Act").

2

Ms. Scarbrough opposed the motion, arguing that those statutes provide immunity only for those who remove the organ from a donor's body or where consent is in dispute. The immunity provisions, she argued, were not intended to apply to those who negligently preserve, package, and transport the organ.

After a hearing, the court granted the motion to dismiss. In its oral ruling, the court interpreted the statutes more broadly than Ms. Scarbrough. The court concluded that the immunity provided by the statutes "is designed to protect organizations such as the [Transplant Resource Center] in this case, and it[]s employees in this case, because of the fact that they have to move with such speed to preserve those organs." Because of that, "there are times when a mistake may be made that would not be made had a group or an individual had more time to consider his or her actions in tak[ing] a course of action[.]" In its written order, the court stated that, under both statutes, "the good faith immunity applies, as here, where Defendants' alleged negligent post-removal conduct was done in good faith." Ms. Scarbrough appealed.

## DISCUSSION

I. **THE ANATOMICAL GIFT ACT AND SECTION 19-310 OF THE HEALTH-GENERAL ARTICLE EXTEND IMMUNITY TO AN ORGAN PROCUREMENT ORGANIZATION'S GOOD FAITH ACTIONS IN RECOVERING AN ORGAN FOR TRANSPLANT.**

This case presents a question of statutory interpretation. Transplant Resource Center contends, and the circuit court agreed, that the two immunity provisions extend to the good faith efforts of an organ procurement organization in recovering an organ for transplant, including the packaging, preservation, and transportation of the organ. Ms.

3

Scarbrough argues that the immunity provided by the statutes ends with the removal of the organ. Based on the plain language of the statute, we agree with Transplant Resource Center and the circuit court.

When interpreting a statute, "[w]e assume that the legislature's intent is expressed in the statutory language and thus our statutory interpretation focuses primarily on the language of the statute to determine the purpose and intent of the General Assembly." *Phillips v. State*, 451 Md. 180, 196 (2017). Thus, "we begin 'with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology.'" *Blackstone v. Sharma*, 461 Md. 87, 113 (2018) (quoting *Schreyer v. Chaplain*, 416 Md. 94, 101 (2010)). In reading the plain language, "we will not add or delete words from the statute." *Melton v. State*, 379 Md. 471, 477 (2004). "We read 'the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.'" *Conaway v. State*, ___ Md. ___, No. 69, Sept. Term, 2018, 2019 WL 3024706, *9 (July 11, 2019) (quoting *Ingram v. State*, 461 Md. 650, 661 (2018)). "In parsing whether plain meaning or ambiguity is the case, we view the relevant statutory scheme as a whole, rather than seizing on a single provision." *Conaway*, 2019 WL 3024706, *9. "If the statutory language is clear and unambiguous, our analysis may end," *id.*; however, even where that is the case, "we often look to legislative intent and purpose to determine if they ratify our analysis and interpretation of a statute," *Hammonds v. State*, 436 Md. 22, 37 (2013).

4

**A.    The Anatomical Gift Act Confers Immunity on Organ Procurement Organizations for Actions Taken to Recover a Donated Organ.**

The Anatomical Gift Act, enacted in 2011 to replace the 1968 Maryland Anatomical Gift Act, "is a modified version of the 2006 Revised Uniform Anatomical Gift Act . . . recommended for enactment in all states by the National Conference of Commissioners on Uniform State Laws[.]" Md. Dept. of Leg. Servs., Fiscal & Policy Note Revised, S.B. 756, at 4 (2011).  The Act applies to an "anatomical gift," which it defines as the "donation of all or part of a human body to take effect after the donor's death for the purpose of transplantation, therapy, research, or education."  Estates & Trusts § 4-501(c).

Organ procurement organizations play a critical role under the Act.  The Act defines such an organization as a "person" designated as such by the Secretary of the United States Department of Health and Human Services.  Estates & Trusts § 4-501(r).[2]  Federal law, in turn, establishes requirements for organ procurement organizations, which must:  (1) be nonprofit entities; (2) maintain accounting and fiscal procedures specified by the Secretary; (3) have an agreement with the Secretary to be reimbursed for the procurement of kidneys; (4) meet the requirements of federal law and have been certified by the Secretary within the prior four years "as meeting the performance standards to be a qualified organ procurement organization"; (5) have "a defined service area that is of sufficient size to assure maximum effectiveness in the procurement and equitable distribution of organs";

---

[2] "Procurement organization" is a separately defined term that includes organ procurement organizations as well as eye banks and tissue banks.  Estates & Trusts § 4-501(v).

5

(6) have sufficient staff "to effectively obtain organs from donors in its service area"; and

(7) have a board of directors that includes hospital administrators, members of the public, representatives of transplant centers, and physicians practicing in certain areas.  42 U.S.C. § 273(b)(1).

Federal law also requires organ procurement organizations to:

(A) have effective agreements, to identify potential organ donors, with a substantial majority of the hospitals and other health care entities in its service area which have facilities for organ donations,

(B) conduct and participate in systematic efforts, including professional education, to acquire all useable organs from potential donors,

(C) arrange for the acquisition and preservation of donated organs and provide quality standards for the acquisition of organs which are consistent with the standards adopted by the Organ Procurement and Transplantation Network . . .,

(D) arrange for the appropriate tissue typing of donated organs,

(E) have a system to allocate donated organs equitably among transplant patients according to established medical criteria,

(F) provide or arrange for the transportation of donated organs to transplant centers,

(G) have arrangements to coordinate its activities with transplant centers in its service area,

(H) participate in the Organ Procurement Transplantation Network . . .,

(I) have arrangements to cooperate with tissue banks for the retrieval, processing, preservation, storage, and distribution of tissues as may be appropriate to assure that all useable tissues are obtained from potential donors,

(J) evaluate annually the effectiveness of the organization in acquiring potentially available organs, and

(K) assist hospitals in establishing and implementing protocols for making routine inquiries about organ donations by potential donors.

42 U.S.C. § 273(b)(3).

The Organ Procurement and Transplantation Network, established pursuant to 42 U.S.C. § 274, is charged with, among other tasks, "assist[ing] organ procurement organizations in the nationwide distribution of organs equitably among transplant patients" and "adopt[ing] and us[ing] standards of quality for the acquisition and transportation of donated organs." *Id.* § 274(b)(2)(D), (E).

Against this federal regulatory backdrop, the Anatomical Gift Act addresses an organ procurement organization's role in the donation and recovery process, including in (1) determining whether an individual who is dead or dying "has made an anatomical gift," Estates & Trusts § 4-512(a); (2) "conduct[ing] any reasonable examination necessary to ensure the medical suitability of" an organ that might "be the subject of an anatomical gift," *id.* § 4-512(b); (3) locating persons who are entitled to make or revoke an anatomical gift on behalf of a prospective donor, *id.* § 4-512(e), (f)(1); (4) communicating information regarding the making, amendment, or revocation of an anatomical gift, *id.* § 4-512(f)(2); (5) "recover[ing] a donated body part from the body of a donor on behalf of an eye bank or tissue bank," *id.* § 4-512(i)(2); (6) entering agreements with hospitals "for coordination of procurement and use of anatomical gifts," *id.* § 4-512(j); (7) charging "for the removal, processing, preservation, quality control, storage, transportation, implantation, or disposal" of an organ or body part, *id.* § 4-513(b); (8) being an authorized recipient of an anatomical gift, *id.* § 4-509(a); (9) receiving an anatomical gift given for transplantation or therapy "as custodian of the organ," *id.* § 4-509(c)(3), (g)(3), (h); and (10) cooperating with the Office of the Chief Medical Examiner "to maximize the opportunity to recover anatomical gifts for the purpose of transplantation, therapy, research, or education," *id.* § 4-518(a).

7

Section 4-514(a) of the Anatomical Gift Act provides: "A person that acts in accordance with this subtitle or with the applicable anatomical gift law of another state, or attempts in good faith to do so, is not liable for the act in a civil action, a criminal prosecution, or an administrative proceeding." The question presented here is whether this grant of immunity extends to the post-removal activities of an organ procurement organization in packaging, preserving, and transporting an organ intended for transplant to the recipient hospital. Ms. Scarbrough contends that it does not, reasoning that such post-removal activities are not regulated by the Act and, therefore, an organization that engages in those activities has not acted "in accordance with this subtitle." Transplant Resource Center counters that the Act does address post-removal activities of organ procurement organizations and, therefore, the immunity provision applies. In resolving this dispute, we consider the role of § 4-514(a) in the context of the entire Act. *See State v. Bey*, 452 Md. 255, 266 (2017) ("[T]he plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute.").

We agree with Transport Resource Center and the circuit court that the immunity provided by the statute is broad enough to encompass the conduct at issue. Although the Act does not regulate the particular procedures that an organ procurement organization must follow in packaging, preserving, or transporting an organ, those activities are still an integral part of the donation and recovery process that the Act covers. In light of the comprehensive federal regulation of the qualifications and activities of organ procurement organizations, as well as the efforts to employ a consistent and complementary approach

8

to the nationwide organ donation system, it should be no surprise that the Act does not attempt to impose a second set of specific requirements. But the Act nonetheless addresses the critical role played by organ procurement organizations in several ways, as detailed above, including by making an organ procurement organization the "custodian of the organ" for the purpose of transplantation. Estates & Trusts § 4-509(c)(3), (g)(3), (h). The actions the organ procurement organization engages in as the custodian, as defined by federal law, include "the acquisition and preservation of donated organs" and "the transportation of donated organs to transplant centers." 42 U.S.C. § 273(b)(3)(C), (F).

Moreover, contrary to Ms. Scarbrough's contentions, based on the plain language of the Act, its coverage does not end with removal of the organ from the donor's body. To the contrary, the statute expressly addresses, and differentiates between, (1) the "removal" of an organ from the donor's body and (2) the "recovery" of the organ for purposes of, among other things, transplant. The Act uses the term "removal" or "remove" to refer to the surgical removal of the organ from the donor's body. *See, e.g.*, Estates & Trusts § 4-508(c) (providing that an oral revocation of an anatomical gift "is effective only if, before an incision has been made to remove a part from the donor's body or before invasive procedures have begun to prepare the recipient," the relevant party has knowledge of the revocation); § 4-512(i)(1) ("A physician or technician may remove a donated part from the body of a donor . . . ."); § 4-512(g)(4) (providing that a donated body part shall be "removed without unnecessary mutilation" of the donor's body); § 4-519(g) (referencing the "removal procedure").

9

By contrast, the statute uses the broader term "recovery" to encompass not just removal, but also additional steps necessary to get the organ to its intended destination. *See, e.g.*, Estates & Trusts § 4-518(a) ("[The Office of the Chief Medical Examiner] and procurement organizations shall cooperate with each other to maximize the opportunity to recover anatomical gifts for the purpose of transplantation, therapy, research, or education."); § 4-512(i)(2) ("An organ procurement organization may recover a donated body part from the body of a donor on behalf of an eye bank or tissue bank."); § 4-519(e) (addressing decisions regarding the recovery of organs by procurement organizations).

Several provisions of the statute use the two terms in close proximity in such a way as to highlight the difference in their meanings. Thus, while § 4-512(i)(1) provides that "[a] physician or technician may remove a donated part . . .," subsection (i)(2) provides that "[a]n organ procurement organization may recover a donated body part . . . ." And § 4-519 distinguishes between the "timely removal" of a body part by the Office of the Chief Medical Examiner and the "recovery of the part" by organ procurement organizations pursuant to agreements with the Office of the Chief Medical Examiner. *Id.* § 4-519(d), (e); *see also id.* § 4-519 (f) ("If OCME or a designee allows *recovery* of a part . . ., on request, the procurement organization shall cause the physician or technician who *removes* the part to provide OCME with a record . . . .") (emphasis added); *id.* § 4-519(g) ("If OCME or a designee is required to be present at a *removal* procedure . . ., on request, the procurement organization requesting the *recovery* of the part shall reimburse OCME or a designee for the additional costs incurred . . . .") (emphasis added).

10

The statute also addresses the compensation organ procurement organizations may recover for their post-removal activities, allowing them to "charge a reasonable amount of money for the . . . processing, preservation, quality control, storage, transportation, . . . or disposal of" a donated body part. Estates & Trusts § 4-513(b)(1).

Finally, the language of the good faith immunity provision is very broad both as to the scope of acts it covers—any that are taken "in accordance with this subtitle" or in good faith attempts to act in accordance with the subtitle, Estates & Trusts § 4-514(a)—and to the scope of immunity afforded—applicable to any "civil action," "criminal prosecution," or "administrative proceeding," *id.* Had the General Assembly intended to limit the immunity to acts relating to determining consent and to the actual removal of organs, it could easily have said so. The breadth of the language used indicates an intent to cover all of the activities addressed by the substantive provisions of the statute.

Based on these provisions, we conclude that the Act extends to the activities of organ procurement organizations in recovering body parts for the purpose of completing the donation, which necessarily includes the packaging, preservation, and transportation of the body parts to their final destination. As a result, an organ procurement organization engaging in those activities is acting "in accordance with" the Act and, therefore, is entitled to immunity for its good faith actions pursuant to § 4-514(a).

Our interpretation of the scope of the immunity provision finds support in the comments to the model Uniform Anatomical Gift Act on which it was based. The Maryland Act instructs us to take into consideration that the statute is a uniform act and thus "consideration shall be given to the need to promote uniformity of the law with respect

11

to its subject matter among states that enact the provisions of this subtitle." Estates & Trusts § 4-520. To that end, the relevant immunity provision of the 2006 Uniform Anatomical Gift Act, which is substantively identical to § 4-514(a) of the Maryland Act,[3] is accompanied by the following comment explaining the scope of immunity intended:

> A version of subsection (a) has been in the two prior anatomical gift acts. . . . As the official comment for Section 7 of the 1968 Act states: "The entire section 7 merits genuinely liberal interpretation to effectuate the purpose and intent of the Uniform Act, that is, *to encourage and facilitate the important and ever increasing need for human tissue and organs for medical research, education and therapy, including transplantation*." Thus, immunity was intended to be extended to persons which generally and substantively act in accordance with the 1968 Act, with honesty of intent.

> *If parties were held to an overly strict adherence to this [act] when transplants must be made shortly after the decedent's death, it might well have a chilling effect on the making of anatomical gifts for the purpose of transplantation or therapy.* This [act] retains the meaning of the term of "good faith" in the 1968 Act in order to encourage and facilitate transplantation. On the other hand, if a person acts in subjective "bad faith," the common law provides remedies.

National Conference of Commissioners on Uniform State Laws, Revised Uniform Anatomical Gift Act (2006) at 50 (Last Revised or Amended in 2009) (Aug. 26, 2009) (emphasis added). In the absence of any indication to the contrary, it is reasonable to presume that the General Assembly shared this statement of purpose when it passed the Act. *See, e.g.*, *Messing v. Bank of Am., N.A.*, 373 Md. 672, 685 (2003) (quoting *Jefferson*

---

[3] Section 18(a) of the 2006 Uniform Anatomical Gift Act provides: "A person that acts in accordance with this [act] or with the applicable anatomical gift law of another state, or attempts in good faith to do so, is not liable for the act in a civil action, criminal prosecution, or administrative proceeding." National Conference of Commissioners on Uniform State Laws, Revised Uniform Anatomical Gift Act (2006) at 49 (Last Revised or Amended in 2009) (Aug. 26, 2009).

*v. Jones*, 286 Md. 544, 547-48 (1979)) (stating that although comments of the drafters of the Uniform Commercial Code "are not controlling authority and may not be used to vary the plain language of the statute, they are an excellent place to begin a search for the legislature's intent when it adopted" Maryland's version of the code); *Clark v. Comm'r of Corr.*, 917 A.2d 1, 15 n.23 (Conn. 2007) ("In the absence of any indication to the contrary, we reasonably may presume that our legislature adopted the act for the same reasons that it was approved by the National Conference of Commissioners on Uniform State Laws."); *Morgan Keegan & Co., Inc. v. Cunningham*, 918 So. 2d 897, 906 (Ala. 2005) ("When a statute is based on a uniform act, we assume that the legislature intended to adopt the construction placed on the act by its drafters.") (internal quotation marks and citations omitted); *Universal Motors, Inc. v. Neary*, 984 P.2d 515, 517 (Alaska 1999) ("In construing statutes taken from model acts we generally regard the commentary to the model act as a reliable guide to the statute's meaning.").

Extension of immunity to organ procurement organizations is consistent with the national conference's stated purpose "to encourage and facilitate the important and ever increasing need for human tissue and organs for medical research, education and therapy, including transplantation." Organ procurement organizations, by law, are special purpose, nonprofit entities established and regulated pursuant to federal law for the purpose of carrying out the important work of facilitating organ donations. As the trial court pointed out, those entities are often called upon "to move with such speed to preserve those organs" in circumstances in which "a mistake may be made that would not be made had a group or an individual had more time to consider his or her actions." It appears that the Legislature

13

concluded that allowing such entities to be sued for negligence in undertaking those activities would likely increase the cost of organ recovery and perhaps encourage behaviors intended to reduce the prospect of liability at the cost of efficiency and effectiveness in facilitating organ transplantation. The breadth of the immunity provision in the Act was a choice by the General Assembly. It is not for us to second-guess that policy decision.[4]

As noted, the Maryland Act instructs us to take into consideration "the need to promote uniformity of the law . . . among states that enact the provisions of this subtitle." Estates & Trusts § 4-520. To that extent, the parties identified only two cases from other jurisdictions that are arguably relevant to the issue before us. Both were decided under earlier versions of the uniform act. In *Seamans v. Harris County Hospital District*, parents of a deceased donor sued the hospital where the donor died for failing to successfully gift the body to the intended recipient for medical research. 934 S.W.2d 393, 394-95 (Tex. App., 14th Dist., 1996). When the university to which the body was to be donated did not return the hospital's initial phone call, the donor's body remained in the hospital's morgue for 22 days, during which it became unsuitable for donation. *Id.* at 394. The Texas intermediate appellate court upheld the dismissal of the parents' suit against the hospital

---

[4] Ms. Scarbrough suggests in her brief that the scope of the immunity provision as interpreted by Transplant Resource Center could be interpreted to extend to negligence in, for example, operation of a motor vehicle that is carrying an organ intended for transplant. We are skeptical that the provision's immunity would reach such an activity, which has nothing to do with the specialized services provided by organ procurement organizations and would not appear to further the purposes of the Act. Resolution of such a claim, however, will need to await a case that presents it.

14

based both on sovereign immunity and the uniform act's immunity provision. *Id.* at 395-96. The entirety of the court's discussion of the immunity provision is:

> As noted above, appellees also claim immunity under the Anatomical Gift Act. The relevant section of the Act provides immunity for a person acting in good faith if the prerequisites for an anatomical gift are met. TEX. HEALTH & SAFETY CODE ANN. § 692.016(a) (Vernon 1992). Appellants claim the hospital acted recklessly and in bad faith. These claims are at best mere conclusions and they do not constitute effective summary judgment proof. *Mercer v. Daoran Corp.*, 676 S.W.2d 580, 583 (Tex. 1984). The deposition excerpts cited by appellants do not show bad faith, but merely establish the failed attempt to notify the Baylor College of Medicine about the donation.

*Seamans*, 934 S.W.2d at 396. The Texas court thus assumed, apparently without the issue being raised, that the immunity provision applied to the hospital's conduct in handling the body after it was ready for packaging and transport to the university. *Id.*

In *Carey v. New England Organ Bank*, parents of a deceased donor sued an organ bank, asserting claims of negligence, misrepresentation, tortious interference with a dead body, and negligent infliction of emotional distress arising from the process by which the organ bank procured the parents' consent. 843 N.E.2d 1070, 1079 (Mass. 2006). The parents argued that the organ bank did not comply with the Massachusetts version of the uniform act when, among other allegations of error, it did not properly record the father's consent. *Id.* The Massachusetts court concluded that the organ bank did not properly record the father's consent, but that its actions were taken in good faith and, therefore, the organ bank was immune under the statute. *Id.* at 1082-84.

Neither of these cases expressly confronted the scope of the immunity provision. Although the court in *Seamans* seemed to accept that the immunity provision applies to

15

conduct relating to the handling of a body part that was ready for donation—in that case, the entire body—it does not appear that the issue was actually raised in that case. The court in *Carey* did not confront the issue at all. Our research has not uncovered any other cases that are on point.

Ms. Scarbrough disagrees with our interpretation of the Act. She argues that because the Act "does not provide procedures and/or responsibilities for the packaging, storing, preserving and/or shipping of a donated organ . . . the negligent performance of those acts does not come under the immunity statute." For reasons we have already discussed, the level of detail at which the Act addresses the activities of organ procurement organizations is not dispositive. The Act covers the role and activities of an organ procurement organization, even if it generally defers to federal regulation of the specifics of those activities. That is enough to bring the recovery activities of organ procurement organizations within the scope of the statute and its immunity provisions.

Ms. Scarbrough also relies on the Fiscal and Policy Note accompanying the bill that became the Anatomical Gift Act as support for her claim that the immunity provision was not intended to protect organ procurement organizations. Although we do not find the statute itself to be ambiguous, we may nonetheless consider legislative history as a means of confirming our interpretation of the statute or "to eliminate another version of legislative intent alleged to be latent in the language." *Blackstone*, 461 Md. at 113 (quoting *State v. Roshchin*, 446 Md. 128, 140 (2016)). Here, assuming for present purposes that the Note provides insight into legislative intent, it does not cause us to alter our interpretation of the statute's plain language. To be sure, the Note identifies that among the goals of the General

Assembly in adopting the Act were "to resolve inconsistencies among states and reduce impediments to transplantation"; "to encourage the making of anatomical gifts"; "to honor and respect the autonomy of individuals to make or not to make an anatomical gift of their body or parts"; and to "preserve[] the current anatomical gift system founded upon altruism by requiring a positive affirmation of an intent to make a gift and prohibiting the sale and purchase of organs." Md. Dept. of Leg. Servs., Fiscal & Policy Note Revised, S.B. 756, at 4 (2011). Although this suggests that the extension of immunity to organ procurement organizations may not have been a primary purpose of the General Assembly's adoption of the Act in 2011, nothing in the Note or any of the other legislative history we reviewed suggests that the General Assembly intended to exclude such entities from the broad coverage of the Act or its immunity provision.

In sum, the immunity provision of Maryland's Revised Uniform Anatomical Gift Act, § 4-514(a) of the Estates and Trusts Article, extends to the actions of organ procurement organizations in recovering organs and other body parts for transplantation, which includes the packaging, preservation, and transportation of the body parts.

**B.** **Section 19-310 of the Health-General Article Confers Immunity on Organ Procurement Organizations for Negligently Packaging, Preserving, and Transporting a Donated Organ.**

For similar reasons, we conclude that the companion immunity provision in § 19-310(a)(11) of the Health-General Article also extends to the activities of organ procurement organizations in recovering organs for transplant. That provision states:

> A person who acts in good faith to recover organs or tissues in accordance with a notation on the decedent's driver's license or identification card that the decedent is an organ donor, a gift made in accordance with § 5-604.1 of

17

this article or Title 4, Subtitle 5 of the Estates and Trusts Article, or a gift made in accordance with the anatomical gift laws of another state or country is immune from criminal prosecution and liability for damages in any cause of action related to the recovery and donation of the decedent's organs or tissues.

Health-Gen. § 19-310(a)(11). Like § 4-514(a), § 19-310(a)(11) is broadly worded to apply immunity to those involved in the recovery and donation process. As discussed above, an organ procurement organization is an entity that "acts . . . to recover" an anatomical gift. Even if we were to agree with Ms. Scarbrough that the actions of such an entity in obtaining an organ, preserving it, and transporting it to its final destination do not themselves constitute the "recovery" of such an organ—and, for reasons discussed above, we do not agree with that—those actions are certainly "related to the recovery and donation of the decedent's organs or tissues."

Ms. Scarbrough contends that this provision is also meant to apply only to those who obtain consent to remove the organ so that "people who need donated organs are not deprived of life-saving transplants because medical providers working under strict time constraints are worried about being sued for removing organs without consent." We grant that the plain language of the provision extends to that circumstance and that providing immunity for good faith mistakes relating to obtaining consent is a primary focus of both immunity provisions. We see nothing in the terms of this immunity provision, however, that restricts its scope to issues of consent. Had the General Assembly intended a narrower scope, it would have been easy to fashion language restricting immunity to, for example, 'any cause of action alleging an absence of proper consent to the donation of the decedent's

18

organs or tissues.'  The breadth of the language adopted by the General Assembly is inconsistent with Ms. Scarbrough's narrow interpretation of its scope.

## II.  THE CIRCUIT COURT DID NOT ERR IN GRANTING THE MOTION TO DISMISS.

Ms. Scarbrough's final contention is that the trial court erred in granting Transplant Resource Center's motion to dismiss, rather than allowing the issue of good faith immunity to be decided by the trier of fact after a trial.  We review a trial court's grant of a motion to dismiss for legal correctness.  *Floyd v. Mayor and City Council of Balt.*, 463 Md. 226, 241 (2019).  "[I]n reviewing the grant of a motion to dismiss, [we] must determine whether the Complaint, *on its face*, discloses a legally sufficient cause of action."  *Pittway Corp. v. Collins*, 409 Md. 218, 234 (2009).  We "presume[] the truth of all well-pleaded facts in the Complaint, along with any reasonable inferences derived therefrom in a light most favorable to the plaintiffs."  *Id.*  Granting a motion to dismiss is proper where "the alleged facts and permissible inferences, so viewed, would, if proven, nonetheless fail to afford relief to the plaintiff."  *O'Brien & Gere Eng'rs, Inc. v. City of Salisbury*, 447 Md. 394, 403-04 (2016) (quoting *Allied Inv. Corp. v. Jasen*, 354 Md. 547, 555 (1999)).

The scope of the immunity provision is a question of law.  *See David N. v. St. Mary's County Dept. of Soc. Servs.*, 198 Md. App. 173, 180 (2011) ("[A] matter of statutory interpretation[] is a purely legal issue.").  Here, the circuit court properly dismissed the complaint because (1) the court correctly determined that the immunity provisions apply to the conduct of Transplant Resource Center and its employees and (2) Ms. Scarbrough's complaint does not allege an absence of good faith or any facts that would support such an

allegation. To the contrary, at oral argument before the circuit court Ms. Scarbrough's counsel expressly acknowledged that "there's no suggestion here that anyone did not act in good faith." In the absence of a factual dispute for the trier of fact to resolve, the court did not err in granting the motion to dismiss.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS ASSESSED TO APPELLANT.**